893 A.2d 1195

STATE DEPARTMENT OF ASSESSMENTS AND TAXATION

v.

David REIER.

No. 273, Sept. Term, 2005.

Court of Special Appeals of Maryland.

March 3, 2006.

David M. Lyon (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellant.

Hillary G. Davis (Davis & Associates Law Office, PA, on the brief), Towson, for appellee.

Panel: DAVIS, DEBORAH S. EYLER and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

DAVIS, J.

The State Department of Assessments and Taxation (SDAT) appeals from an Opinion of the Circuit Court for Baltimore County. SDAT assigns error to the decision of the Office of Administrative Hearings (OAH) to rescind SDAT's termination, and reinstate the employment of David Reier as an assessor for SDAT. It also challenges the court's decision to award Reier reinstatement of his employee benefits and the OAH decision to award Reier full back pay. SDAT presents three questions for our review, which we rephrase as follows:

1. Did OAH improperly re-decide previously determined facts, upon remand from this Court, when it answered two questions under the new statutory interpretation of State Personnel and Pensions Article § 11–106?

2. If new fact-finding was required, did OAH abuse its discretion when it refused to accept and review evidence addressing the circumstances surrounding an exhibit, when that very exhibit was now being highlighted by Reier in a new way and was relied upon by OAH as the primary point of reference when re-deciding the sequence of events?

3. Did the circuit court improperly reverse the decision of OAH when it held that the statutory remedy in § 11–110(d)(1)(iii) included all lost employee benefits?

We answer the first and second questions in the negative, and the third question in the affirmative. We shall therefore affirm OAH's decision, and reverse the decision of the lower court.

## FACTUAL AND PROCEDURAL BACKGROUND

As this appeal represents the second occasion for this Court to review arguments in this case, we liberally quote from the background facts set forth in our review of the first appeal, including footnotes,[1] reproduced from the unreported opinion of *Reier v. State Dep't. of Assessments and Taxation*, No. 2456, September Term 2001, slip op. at 2–25 (filed December 19, 2002):

On October 7, 1996, SDAT terminated Reier from his position as a property assessor for Carroll County. Reier appealed his termination to the Director of SDAT, who affirmed the termination. Reier then appealed to the Office of Administrative Hearings ("OAH"), and the matter was assigned to Administrative Law Judge ("ALJ") Gayle Hafner. ALJ Hafner held hearings on April 17 and May 7 of 1997 to determine the legality of Reier's termination. She filed a decision on June 23, 1997, in which she upheld appellant's termination. Reier then filed a petition for judicial review in the Circuit Court for Baltimore County.

Prior to hearing the matter, the trial judge learned that we would interpret [State Personnel and Pension] section 11–106(b)'s thirty-day time limit in the *Geiger* case, which was then pending before this Court. The trial judge postponed the hearing of the matter pending our decision in that case. After we decided the *Geiger* case, *Western Correctional Institution v. Geiger*, 130 Md.App. 562 [747 A.2d 697] (2000), the circuit court heard arguments and determined

---

1. Footnotes three—six in this opinion represent footnotes two—five in the original.

that the administrative record was insufficient to make a proper decision. He remanded the case to the agency for further findings of fact as to "whether the investigation was carried out with reasonable diligence." This remand was necessary due to the test we enunciated in *Geiger*. On remand, another ALJ (Spencer) heard additional evidence and concluded that Reier had not met his burden to establish a *prima facia* [sic] case that SDAT had violated section 11–106(b)'s time requirement. On December 31, 2000, the circuit court filed a memorandum opinion and order, affirming the original administrative decision, which had upheld Reier's termination. This appeal followed.

## II.  EVIDENCE PRESENTED AT THE TWO ALJ HEARINGS

David Reier began his employment with SDAT in March of 1990 as an Assessor I. In the next three years, he advanced to the position of Assessor III. He was reassigned from SDAT's Baltimore City office to the Carroll County office in 1993. Reier worked at SDAT's Carroll County office from 1993 until his termination in October of 1996.

The Carroll County SDAT office is charged, *inter alia,* with performing physical inspections of each of the county's approximately 48,000 residential properties. As a part of this process, the office receives copies of residential building permits involving improvements. Residents are required to bring their building permits to the SDAT office where the clerical staff enters the information into the data system. Office personnel then file the building permits in a file cabinet in a small "permit" room in the office. The permits remain filed until an assessor inspects the property.

Reier's job duties included performing field inspections and assessing residential properties, reviewing building permits for each property, reviewing and noting sales data concerning properties to be assessed, conducting field interviews with adults residing at the properties, making comparison between his physical review and the pre-existing assessment, noting any changes on the field card kept for

each property, and completing all associated paperwork. Assessors also are required to be available in the office once a week to answer questions from the public.

SDAT management periodically assigns the assessors a list of properties to be inspected. After receiving their assignments, assessors are required to pull their properties' field cards and check the building permit file to see if any building permits have been submitted for the properties since the date of the last inspection. If a building permit has been submitted for an assigned property, the assessor is required to attach it to the property field card, and bring both the field card and permit along when an inspection of the property is made. The purpose of this requirement is to aid the inspectors in gaining knowledge of all assessable changes made to the properties since the previous inspection.

At the time of inspection of the properties, assessors are required to note on the building permits (1) what progress, if any, has been made towards completion of the improvements, (2) the date on which they performed the inspections, and (3) their assessor numbers. If the assessor finds that the improvement has been completed, they are required to mark the permit as "assessed," perform the assessment, and return the marked permit to a specific individual in the office. If the assessor finds the improvement has not been completed, he or she must note that fact on the permit and then re-file it in the filing cabinet from which it was obtained. This cabinet is called the un-assessed building permit filing cabinet. In addition, after completing each inspection, the assessor must mark the field card so that it reflects any changes made to the property, the date of the most recent assessment, and the assessor's number. The assessor then values the properties according to the physical characteristics recorded on the field cards.

At all times here relevant, Larry C. White was the Supervisor of Assessments for Carroll County. The Assistant Supervisor of Assessments for Carroll County was

William F. Norris, Jr. Mr. Norris was Reier's direct supervisor.

On July 24, 1996, Messrs. White and Norris called a meeting of all the assessors in the Carroll County office. At that meeting, they distributed a memorandum entitled "Department Guidelines for Job Performance," which outlined the proper methods for performing field inspections. This memorandum, among other things, reminded the assessors that they should make notes on the building permits at the time they inspect the properties.

A few weeks later, in early August of 1996, Mr. Norris found a group of eight to ten building permits stacked on a cabinet in the permit room. There were no notations on these permits.

At the April 1997 hearing before ALJ Hafner, Mr. Norris testified as to this discovery:

I found [the permits] in a stack on a corner of the cabinet, and I wondered why they were there. There was no notation on them that they had been assessed or visited or anything. From checking further I found that they were accounts which had been assigned to Mr. Reier, and that's why we checked those. They should not have been there. They should have either been back in the file with a notation that work was underway, or they should have been assessed and put in the assessed file.

Q. So you found the permits in a pile?

A. Um-hum. Stacked.

Q. And when was this?

A. *I think it was in the first part of August.*[2]

\* \* \*

Q. . . . Had you started reviewing [Mr. Reier's] work at the time that you found that pile?

A. No.

---

2. Underlining appeared in original.

Q. Okay. *What did you do with the permits?*

A. *I went out and checked them in the field to see if they were in fact any degree of completion, not completion, not started or whatever.*

Q. Why didn't you just give the pile to Mr. Reier, since they were his accounts?

A. I could have done that. This is a good way to check to see if anybody was there. It's a quality control check.

Q. Well, how do you know if he had been there?

A. *Because I pulled the card and the card said May of 1996.* So that indicates to me that the—*it said on the field card with his number that he was there in May of 1996 or whenever. That indicated to me that he had already been there, but yet there was no indication on these permits that anybody was there.*

Q. How do you know the permits had been available or pulled prior to his visit?

A. They were in the file. *Some of them had been in the office since 1993.* It's the assessor's job to pull the permits when he gets these cards.

Q. But you have no way of knowing that the permits were even available?

A. They are in the office in the permit file. I don't know what you mean by available.

Q. Well, this group of permits were in a pile. They obviously weren't where they should have been, and you don't know how they got there. So how do you know that they were ever where they were supposed to be?

A. I'm assuming that they weren't where they were supposed to be, *and if someone was at the property, they would have noticed these changes. Whether you have a permit or not,* when you go to a property and there is something added, you pick it up. You go to a property and you don't have a permit, and there's an attached garage there that is not on the card, you just ignore that? That's not the procedure.

(Emphasis added.)

Mr. Norris further testified that after finding the permits he discussed the matter with Mr. White, who said, "Let's go out and look at [the properties mentioned in the permits]." According to Mr. Norris, they went to the properties and found that, even though Reier's records showed that he had visited the properties and even though the improvements to the properties had been made, Reier had failed to note the improvements even though those improvements would have been open and obvious if Reier had walked to the rear of the premises as required.

Mr. White testified at the ALJ hearing conducted in April 1997 as follows:

Q. Now, when did you first become aware that there was any kind of a problem with Mr. Reier's work performance?

A. I found [their] permits.

Q. You found them?

A. Well, Lou [Norris] found them, actually—Mr. Norris found them.

Q. Where did he find them?

A. Somewhere over where he was supposed to have his permits. They were in the vicinity of the permits where they were located.

\* \* \*

Q. And you told [Mr. Norris] to give them back to Mr. Reier.

A. No. I said, well, this will be a good test. We're checking everybody's work anyway. Let's go look and see if he's—(inaudible)—these things up, and low and behold, he hadn't.

Q. So, at that point, did you speak with Mr. Reier about this?

A. No.

Q. And why was that?

A. I didn't think it was a concern at that point.

Q. You didn't think it was a concern at that point, deficiencies weren't worth—weren't enough for you to have a counseling session with him?

A. Not at that time.

Neither Mr. White nor Mr. Norris was asked at the April 1997 hearing when they went to the properties—mentioned on the permits—to check to see if Reier had performed his duties properly. But Jack Ferguson,[3] an Assessor III, testified that in "either late August or early" September 1996, he was asked by Mr. White and Mr. Norris to check "20 or 30" properties that Reier had already visited. Ferguson [sic] testified:

Q. Okay. Did you ask them what the reason was, why you're going out and rechecking?

A. No. Yeah. *Because they thought some of them had been missed or something.* Just wanted to make sure stuff wasn't missed.

Q. Is this something you had ever done before?

A. No. No.

Q. Did you ask the reasons why you were going about rechecking?

A. No. I just assumed I was supposed to, *because we had found some discrepancies in some of the work that was done.* So we just wanted to check all the work and make sure it was right for that, you know, the end of that year.

Q. What, if anything, did they say to you about these particular permits that you were given to check?

A. Just to go out and look at the properties and see if the additions and the decks and whatever that were on the permits were there.

---

**3.** The original incorrectly lists Mr. Jack Burgesen's name as "Ferguson" and "Berleson." Any reference to either surname should read Burgesen.

Q.  How many errors did you find out of this group of 20 or 30?

A.  About 20.

(Emphasis added.)

According to a notation on one of the permits for one of the premises re-inspected by Ferguson [sic], a re-inspection was done by Ferguson [sic] on September 4, 1996, *i.e.,* more than thirty days before Reier was fired.

The original hearing before ALJ Hafner was continued until May 7, 1997.  When the hearing resumed, Mr. White testified that he first realized there was a problem with Reier's work when he visited the properties—which he said was during the week of September 9, "like the 9th, 10th, and 11th."  In that hearing, he contradicted his earlier testimony and swore that finding the permits on the cabinet did not alert him that there were problems with Reier's work. He stressed that management did not immediately check the field cards to see which assessor had been assigned to evaluate the properties mentioned in the report and that Reier did not advise management until September 2, 1996, that he had completed his field work.

Mr. White also testified more than three years later, at the hearing before ALJ Spencer, on September 6, 2000, as follows:

MR. LYON [4] [ATTORNEY FOR SDAT]: And what triggered the investigation?

MR. WHITE: The missed permits.

MR. LYON: And—

MR. WHITE: Well, we did a review of the permits that were found, which at the time we found them was—you know, like I said, Mr. Reier didn't finish his work until September 3rd.  There was a holiday I think in there, too. And I was away that Friday and anyway, I came back and we started his check on his quality control, for lack of a better word.

---

4.  The transcript inaccurately refers to Mr. Lyon as "Mr. Lony."

Once I found out that—I don't think he was in any of these properties. And then it just, you know, kind of like snowballed. You know, I called downtown and of course-advise me on what to do on something like this.

Mr. White also testified in September 2000 that, after each assessor finishes physically inspecting each group of properties assigned to him or her, the assessor is required to let Management know. Management then performs routine quality control "spot" checks or audits of a sampling of the assessor's field work. According to Mr. White's testimony in 2000, the supervisors routinely performed these quality-control checks every September as a means of assuring adequate assessor performance. The audit process usually entails randomly selecting approximately fifteen properties from each assessor's file and performing an independent field inspection of the selected properties to determine whether an assessor's inspections have picked up any relevant improvements/changes to the property and whether all proper notations on the field cards and building permits have been made. In Reier's case, however, management did not begin with a random selection of the properties Reier had inspected; instead, the audit began with an inspection of the properties mentioned in the misplaced building permits. The audit was completed by September 13, 1996, according to Mr. White's testimony. That audit revealed that the improvements listed on the building permits had been completed in all cases and all the improvements were visible from the outside of the property. This was important because SDAT expected its assessors to note on the building permits and field cards any visible improvements. Reier had uniformly failed to do this according to Mr. White.

Mr. White additionally testified at the September 2000 hearing that, after completing the initial audit, SDAT's management undertook a full-scale investigation of Reier's assessments, which revealed numerous and substantial deficiencies in his performance. SDAT completed its full investigations by the end of September 1996, whereupon Reier

met with Mr. White on October 3, 1996. At that meeting, Reier was given an opportunity to defend his poor performance. Reier did not cooperate, refused to even look at the examples of his errors, and responded three times to inquiries by saying that he was just a "bad assessor." Additionally, he admitted to not getting out of the car and walking the properties he inspected as required by departmental procedures.

On October 7, 1996, Reier was given a termination notice that advised him of his termination and the reasons for it:

1. That the employee has been negligent in the performance of his duties.

2. That the employee has been guilty of conduct such as has brought or, if published, would bring the State into disrepute.

3. That the employee has violated any lawful order or has failed to obey any lawful order given by a superior officer when the violation or failure to obey amounts to insubordination.

4. That the employee has engaged in insolent behavior constituting a serious breach of discipline that undermines management's authority and lowers employee morale.

5. That the employee is incompetent, inefficient, or indolent in the performance of his duties.

6. That the employee has engaged in willful misconduct, without justification, that has compromised the integrity of real property assessments in Carroll County.

7. That the employee has displayed indifference towards his job and responsibilities as a State employee.

## III. *ALJ HAFNER'S FINDINGS OF FACT*

ALJ Hafner, the first ALJ to consider this case, found, *inter alia,* the following facts to be true:

9. The Employee knew the standards for field assessments and documentation requirements.

\* \* \*

11.  In August 1996 Management discovered a stack of building permits which were inappropriately stored on the corner of a filing cabinet.  The properties reflected in the permit were assigned to the Employee.  Of the permits reviewed, Management found more than 50% of the assessments had errors significant enough to affect the valuation and the reassessment of the property.  *The errors reflected that the Employee did not visit the property or did not go to the back or side of the property.*  The permits should have been filed with the property cards that were already filed as completed assessments.

12.  In early September 1996 Management reviewed the Employee's assessments for 68 sold properties.  Management discovered 21 significant errors which affected property valuations.

13.  In mid-September 1996 Management selected and reviewed an entire box of the Employee's completed assessments and computer sheet edits, a total of 300, and found 87 properties with significant errors affecting valuation.

14.  On September 30, 1996, an assessment from the State Office reviewed the field work on 33 properties.  Of the 24 properties with changes from the previous assessment, the Employee had accurately reflected one change, incorrectly noted five of the changes that he identified, and failed to reflect 18 significant changes, including a variety of add-on decks and additional buildings.

15.  The Employee usually did not walk around the property, often did not get out of his car, and did not attempt to contact the homeowner or an adult household member.  The Employee did not correct data entry errors in the computer sheets as required.

(Emphasis added.)

## IV.  *THE TWO GEIGER DECISIONS*

As mentioned earlier, the trial court remanded this case to the OAH for additional fact-finding.  This additional fact-

finding was necessary in order to comply with the opinion of this Court in *Western Correctional Institution v. Geiger.* We said in *Geiger:*

> We reject appellee's contention that the 30–day limitation period begins the moment that the appointing authority acquires any knowledge, however slight, of the incident for which disciplinary action is ultimately imposed. There is an important distinction between (1) information that indicates the necessity for an investigation, and (2) the completion of an investigation by § 11–106(a)(1). The statutory check found in § 11–106(b) does not start *until the appointing authority had [sic]—or, in the exercise of reasonable diligence, should reasonably have—acquired enough knowledge to justify the imposition of discipline.*

*Geiger,* 130 Md.App. at 569, 747 A.2d 697 (emphasis added). In *Geiger,* we also said:

> [W]hen a disciplined employee contends that the time limitation of § 11–106(b) has not been complied with, the employee must overcome the presumption of correctness by making a *prima facia* [sic] showing that the appointing authority was "on notice" of the alleged misconduct more than 30 days before the disciplinary action was imposed. If the employee does succeed in showing, *prima facie,* that the appointing authority was on notice of the purposed [sic] misconduct on a day more than 30 days before the employee was ultimately disciplined, the disciplinary action shall be rescinded unless that appointing authority proves by a preponderance of the evidence that (1) the investigation required by § 11–106(a)(1) was conducted with reasonable diligence and (2) the disciplinary action at issue was imposed no later than 30 days after the required investigation had been completed.

*Id.* at 569–70[, 747 A.2d 697].

The Court of Appeals, in its *Geiger* decision, explicitly rejected our reading of [State Personnel and Pension] section 11–106(b)(*l* ). *See Geiger,* 371 Md. at 144, 807 A.2d 32. According to the Court of Appeals, the thirty-day clock does

not start when the employer has enough knowledge to justify the imposition of discipline; instead, the clock starts to run when the employer acquires knowledge sufficient to order an investigation of the misconduct for which discipline is imposed. *Id.*

## V. *ALJ SPENCER'S DECISION*

One of the main problems we face in reviewing this case is that ALJ Spencer made her fact-finding applying the test set forth in our *Geiger* decision, which has since been overturned. ALJ Spencer ruled:

The Employee was terminated because of negligent, incompetent and inefficient work performance that compromised the integrity of the real property assessment in Carroll County. *The initial discovery of the permits, however, was not sufficient notice to support terminating the Employee.* A review of the properties reflected on the permits confirmed that the Employee had been to the properties but had not placed notations on the permits. *Clearly the failure to complete the permits was an error but at the time the permits were discovered, the Employee had not completed his field work.* If Management had discovered that the Employee had not reported to the properties, that would have indicated the need for an immediate investigation. However, the Employee was performing his duties, he had just failed to complete the permits. Since the Employee had not completed his fieldwork, it was reasonable for Management to wait until the Employee had completed his fieldwork before conducting an audit of his work.

*While I agree with the Employee that the initial discovery of the incomplete permits was notice of errors in performance, it was not notice of misconduct to justify termination. . . . It is clear from the evidence presented by Management in support of the charges that Management was not on notice of the misconduct that resulted in the charges until the audit began on September 9, 1996.* Management initially only discovered 8 to 10 permits

while the initial audit involved 68 properties with 21 errors. The initial discovery of the permits did not form the basis for the Notice of Termination and the investigation of those permits did not produce notice of misconduct to justify the imposition of the discipline.

In light of the above, I find that the Employee has failed to overcome the presumption of correctness by making a *prima facie* showing that Management was on notice of the alleged misconduct more than 30 days before the Employee was disciplined. Based on the facts in this appeal, *Management was on notice as of September 9, 1996 of the alleged misconduct that justified the Notice of Termination. The notice of termination was filed on October 7, 1996, less than 30 days after Management acquired sufficient notice of the misconduct.* Accordingly, the notice of termination was filed in a timely manner. (Emphasis added.)

Earlier in her opinion, ALJ Spencer set forth her factual findings concerning "the thirty-day-clock" issue as follows:

3. In early August 1996, Lumen [sic] Norris, Assistant Supervisor of Assessments for Carroll County, found a stack of 8 to 10 building permits on a cabinet. There were no notations of [sic] the permits. The properties reflected on the permits were assigned to the Employee.

4. Mr. Norris discussed the permits with Larry White, Supervisor of Assessments for Carroll County. Mr. Norris and Mr. White took the permits and went to the properties to determine if work had been performed pursuant to the permits. *They discovered that the Employee had been to the properties but had not made any notations on the permits.*

5. On September 3, 1996, the Employee completed his fieldwork.

6. As part of a quality control review, once an assessor completes his fieldwork, Mr. White conducts a random audit of the assessor's work.

7. On September 9, 1996, Mr. White conducted a field audit of the Employee's completed fieldwork. The assessments for 68 properties were reviewed and 21 errors, which affected property valuations, were discovered.

8. Between September 14 and September 30, at least three more audits of the Employee's work were conducted. One of the audits revealed 87 out of a total of 300 properties with errors affecting evaluation. Another audit reviewed the fieldwork on 33 properties. Of the 24 properties with changes from previous assessments, the Employee accurately reflected one change, incorrectly noted five changes that he identified[,] and failed to reflect 18 changes, including decks and additional buildings on the properties.

(Emphasis added.)

The chronology set forth above suggests—but does not definitively establish—that prior to September 3, 1996, Messrs. Norris and White went to the property mentioned on the mislaid permits and discovered that Reier had not noted the improvements on the permits even though he had claimed to have been on the premises. If that suggestion is accurate, management would have known by at least September 3, 1996, that Reier was not performing his job properly—provided that management looked at the field cards for the properties prior to September 3, 1996.[5] If the field cards were reviewed shortly after the permits were discovered (as suggested by Mr. Norris's April 17, 1997, testimony quoted *supra* ), there is no doubt that the employer would have then known not only that Reier had failed to note improvements on the permits but that he had claimed to have been to the properties but had failed to see the improvements and note them on the field cards. Thus, under that scenario, at least by September 3, 1996, when

5. Mr. Norris's April 1997 testimony indicates he did "pull" the field cards prior to visiting the properties mentioned in the eight to ten misplaced permits.

Reier reported that he had completed his field work, the employer's knowledge clearly would have been sufficient to launch an investigation. The trouble is, however, we cannot know for sure, because no explicit determination was made by either ALJ Hafner or ALJ Spencer as to when management looked at Reier's field notes.[6]

## VI. *THE COURT OF APPEALS' GEIGER DECISION AS APPLIED TO THIS CASE*

Both parties wrote their initial briefs based on the assumption that our decision in *Geiger* accurately enunciated the applicable law. After the Court of Appeals's decision, Reier wrote a reply brief in which he contended that SDAT "actually launched its investigation" into the misconduct that led to his termination prior to September 7, 1996. Because knowledge of facts sufficient to launch an investigation into the misconduct for which Reier was terminated on October 7, 1996, started the thirty-day clock to tick, appellant argues that the disciplinary action for which he was fired must be rescinded.

In its brief, SDAT asserts that the core reason Reier was terminated was "that his field inspections and final work product were so poor that they indicated he was intentionally not performing his duties or just superficially doing them." We agree. The question then becomes: Did the employer have knowledge sufficient to order an investigation into the question of Reier's poor performance prior to September 7, 1996? SDAT asserts that the answer to that question is "no." It further assert [sic] that it was not put on notice of Reier's poor performance until September 9, 1996—when Messrs. White and Norris went to the premises (mentioned in the permits discovered in early August 1996) and found that various improvements mentioned in those permits had been completed but had not had been discovered by Reier. SDAT further asserts that the inspec-

---

6. ALJ Hafner's Finding of Fact No. 11 suggests, but did not say definitively, that this was done in August 1996.

tion of the premises (mentioned in the misplaced permits) was in lieu of the usual random re-inspections that are routinely performed concerning the work of all their assessors.

Reier counters that the evidence is clear that in the various hearings before the two ALJs, SDAT consistently pointed to the discovery of the permits in August 1996 as its initial notice that there were problems with the employee's performance. Reier also points out that the notation on one of the building permits for one of the properties the employer ordered reinspected indicates that the inspection was made on September 4, 1996. Additionally, Mr. White testified, at one point, that he and Mr. Norris first began to check Reier's work on September 2, 1996.[7]

Taking the evidence produced at the various hearings before the ALJ in the light most favorable to Reier, one could find the following facts:

1. That eight to ten permits were found in early August 1996 laying atop a file cabinet;

2. Mr. Norris determined immediately that the properties mentioned in the permits had all been assigned to Reier to assess.

3. That management knew prior to September 3, 1996, that there was a problem with Reier's work, and prior to September 4, 1996, management asked Jack Berleson [sic] to investigate the quality of Reier's work.

4. That by September 4, 1996, Jack Berleson [sic] started to investigate whether Reier had properly inspected the various premises mentioned in the eight to ten misplaced permits.

On the other hand, if we take the evidence in the light most favorable to SDAT, the employer never suspected that Reier had not been properly performing his job until September 9, 1996, which was the date Messrs. White and Norris visited the various premises mentioned in the mis-

---

7. He later said, however, that the date was September 9, 1996.

placed permits and found that Reier had failed, on repeated occasions, to note on the assessment records that various open and obvious improvements had been made to the properties mentioned in the misplaced permits.

In our view, the date that SDAT acquired knowledge sufficient to order an investigation into whether Reier had been properly performing his field work was when the employer discovered (1) that improvements (mentioned on the misplacement [sic] permits) had been performed *and* (2) that Reier had visited the premises but had failed to note on SDAT's field cards that the improvements had been completed. As already noted, the evidence presented to the two ALJ's is conflicting as to when the employer received the knowledge necessary to launch an investigation. ALJ Spencer (understandably) never answered that question. Instead, she answered the question posed by the *Geiger* decision by this Court: "When did the employer acquire sufficient knowledge of the alleged misconduct to justify the termination?" she answered, "September 9, 1996." In arriving at that answer, ALJ Spencer said that it was "reasonable for Management to wait until the employer completed his fieldwork before conducting an audit of work." Because Reier's field work was completed on September 3, 1996, this at least suggests, but does not compel, the conclusion that the ALJ thought that the employer, as of September 3, 1996, had good reason to believe that Reier's field work was being done incompetently.

The employer asserts:

> Consistent with White's normal practice, the field audit of Reier's work was not done until after he had indicated his field work was finished on September 3, 1996. Neither Mr. Norris nor Mr. White reviewed the assessment work sheets when the permits were found or before they subsequently visited the properties on September 9th. Consequently, when they visited the properties, they did not know whether the improvements had been started or finished or whether the assessment records reflected those improvements. However, the September 9th field

audit revealed that the improvements on the permits had been completed. When they returned to the office and checked the work sheets, Mr. White and Mr. Norris learned for the first time that Reier had failed to record the new improvements.

(References to record extract and footnotes omitted.)

There is evidence in the record to support each of the facts set forth in the paragraph just quoted. But, as we have already noted, many of those facts were contrary to earlier testimony by Reier's witnesses. And, while ALJ Spencer did find that Mr. White "conducted a field audit of the Employee's fieldwork" on September 9, 1996 (Finding No. 7), it is not at all clear that the "field audit" she is referring to is the audit of the premises (referred to in the misfiled permits) because (1) she says in Finding No. 4 that White and Norris visited the premises (mentioned in the misplaced permits) on a date, which she does not specify, and then discovered that Reier "had been to the properties but had not made any notation on the permits" and (2) in Finding No. 7, she indicates (but does not say explicitly) that the audit performed on September 9, 1996, was far more extensive than merely checking the premises mentioned in the misplaced permits. As stated earlier, Finding No. 7 was that the September 9 audit uncovered the fact that Reier had assessed 68 properties and had made 21 errors "which affected property valuations."

We shall remand this case to the Circuit Court for Baltimore County with instructions to once again remand the case to the OAH. Upon remand, the ALJ shall answer the following question: When did SDAT acquire information sufficient to launch an investigation into whether Reier's work performance was "negligent, incompetent, and inefficient." The ALJ should also answer the following subsidiary questions: Did SDAT's agents go to the premises (mentioned in the misplaced permits) prior to September 7, 1996, to determine if the improvements mentioned in the permits had been completed? If the answer to that question is "yes," did SDAT know prior to September 7, 1996,

that Reier had been to the premises (mentioned in the misplaced permits) but had failed to note on the field cards the fact that improvements to the property had been made? If the answer to *both* those questions is "yes," then, as a matter of law, SDAT's termination of Reier must be rescinded. If the answer to either of these questions is in the negative, then Reier's termination should be upheld.

Pursuant to our decision to remand the matter to the circuit court, which would then remand to OAH to consider our questions in light of the Court of Appeals' decision in *Geiger*, both parties submitted memoranda to OAH in support of their respective positions for, and against, the need for additional evidence. SDAT claimed our questions could be answered without additional evidence. In the event OAH decided additional fact-finding would be necessary, SDAT specifically requested "that evidence be allowed to offset the loss of the original testimony through which Management Ex. # 9 (the exhibit dated 9/4/96) was entered."[8] Reier countered that the testimony and evidence adduced from prior hearings contained all the necessary information for the agency to follow our mandate and properly answer the pertinent questions. ALJ Spencer agreed with Reier and denied SDAT's request for additional evidence in a letter to both parties dated October 24, 2003.

---

8. SDAT proffered the following evidence:

(1) Those two properties are only 13 houses apart because the street changes its name at the intervening intersection. . . .

(2) Mr. Burgesen did not remember the exact date he visited either, but he did remember that he parked between the two properties and visited them both on the same day. (That makes at least two of the recorded dates wrong.)

(3) Although Mr. Burgesen did not remember the exact timeframe of this review, he did remember that it was done over a 10 to 14 day period and that he was not working on it the entire month of September. (That proffer was put in the context that Burgesen reinspected 30 permit properties, that there were three other permits which he dated September 30th, and that the standard for inspections was 50 properties per day.)

(4) Mr. Burgesen also remembered that Joe Wagner was around the office at the time he was doing this review. (Wagner was ordered to review Reier's property during the third week of September.)

After hearing oral argument on March 8, 2004, ALJ Spencer, in a Decision after remand dated April 12, 2004, reprinted many of the findings of fact she made on December 8, 2000, *supra,* and proceeded to make additional findings:

9. On October 3, 1996, Management met with Reier to discuss the results of the audits and to provide Reier an opportunity to offer mitigation.

10. On October 7, 1996, Reier was provided with the Notice of Termination.

As a result of the remand order and further review of the record, I find the following additional facts:

11. Mr. Norris found a stack of misplaced permits in August 1996. There were no notations of the permits that the property had been assessed or visited. Upon further checking, Mr. Norris concluded that the properties had been assigned to Reier.

12. After finding the field cards, Mr. Norris pulled the field cards to determine if Reier had been to the properties. The notation on the field cards indicated Reier had been to the properties.

13. Mr. Norris discussed his findings with Mr. White. Both Mr. Norris and Mr. White then went to the properties identified in the permits.

14. Mr. White next instructed Jack Burgeson [sic], another assessor, to reassess the properties.

15. Mr. Burgeson [sic] conducted reassessments on September 4, 1996, September 14, 1996, and September 30, 1996.

ALJ Spencer then addressed our questions on remand, and concluded:

I. Did SDAT's agents go to the premises (mentioned in the misplaced permits) prior to September 7, 1996, to determine if the improvements mentioned in the permits had been completed?

As reflected in the testimony from the April 17, 1997 hearing, Messrs. Norris, White and Burgeson [sic] went to

the properties mentioned in the misplaced permits prior to September 7, 1996. Mr. White testified that he found the misplaced permits in August 1996 and concluded that the properties had been assigned to Reier. He then pulled the field cards and concluded that Reier had been to the properties. Next, he discussed his findings with Mr. White. Both Messrs. White and Norris testified that they then went to the properties identified in the misplaced permits. After going to the properties, Mr. White testified that he instructed Jack Burgeson [sic] to reassess the properties. Mr. Burgeson [sic] conducted a reassessment on September 4, 1996. Thus, based on the testimony presented at the April 17, 1997 hearing, SDAT's agents went to the properties mentioned in the misplaced permits prior to September 7, 1996.

At the hearing conducted on May 7, 1997, Mr. White testified that he went to the properties during the week of September 9, 1996. At the September 6, 2000 hearing, Mr. White changed his testimony. He first testified that he went to the properties on September 2, 1996. This is highly unlikely, however, because September 2, 1996 was a State holiday (Labor Day). He then testified that he went to the properties on September 7, 1996. Again, this is highly unlikely because September 7, 1996 was a Saturday. Finally, he again testified that he went to the properties on September 9, 1996 after Reier completed his field work.

After reviewing the evidence, I conclude that the testimony at the April 17, 1997 hearing is more credible and accurately reflects that chronology of events in this case. Messrs. Norris and White went to the properties prior to September 4, 1996. After they went to the properties, Mr. White assigned Mr. Burgeson [sic] to conduct reassessments. Mr. Burgeson [sic] conducted a reassessment on September 4, 1996 as reflected by his notation on the permit. Contrary to the argument presented by SDAT, there is no reason to conclude that the notation was in error. While it is not clear as the exact date the [sic] Messrs. Norris and White went to the properties, it is clear

that they went to the properties prior to Mr. Burgeson's [sic] assignment to conduct a reassessment and it is also clear that Mr. Burgeson [sic] reassessed at least one of the properties on September 4, 1996.

II.   Did SDAT know prior to September 7, 1996, that Reier had been to the premises (mentioned in the misplaced permits) but had failed to note on the field cards the fact that improvements to the property had been made?

At the April 17, 1997 hearing, Mr. Norris testified that after he found the misplaced permits in August 1996, he pulled the field cards and determined that Reier had been to the properties. This was done prior to September 4, 1996 when Mr. Burgeson [sic] began to reassess the properties. In addition, in order to conduct the reassessment, Mr. Burgeson [sic] would have had to have the field cards in order to note if any improvements had been recorded. Thus, the answer to the question is yes—SDAT knew prior to September 7, 1996 that Reier had been to the properties mentioned in the misplaced permits but had failed to note on the field cards that the fact the improvements to the property had been made.

In the remand order, the court, after listing findings of fact number 3 through 8 from my December 8, 2000 decision, noted the following:

The chronology set forth above suggests—but does not establish—that prior to September 3, 1996, Messrs. Norris and White went to the property mentioned in the mislaid permits and discovered that Reier had not noted the improvements on the permits even though he had claimed to have been on the premises. If that suggestion is accurate, management would have known by at least September 3, 1996, [that Reier] was not performing his job properly—provided that management looked at the field cards for the properties prior to September 3, 1996 (footnote omitted) If the field cards were reviewed shortly after the permits were discovered (as suggested by Mr. Norris's April 17, 1997, testimony quoted *supra* ), there is no doubt that the employer would have then known not

only that Reier had failed to note improvements on the permits but that he had claimed to have been to the properties but had failed to see the improvements and note them on the field cards. Thus, under that scenario, at least by September 3, 1996, when Reier reported that he had completed his field work, the employer's knowledge clearly would have been sufficient to launch an investigation.

Furthermore:

In our view, the date that SDAT acquired knowledge sufficient to order an investigation into whether Reier had been properly performing his field work was when the employer discovered (1) that improvements (mentioned on the misplaced permits) had been performed *and* (2) that Reier had visited the premises but had failed to note on SDAT's field cards that the improvements had been completed.

In light of the preceding discussion, I conclude that as of September 4, 1996, SDAT had discovered that the improvements mentioned on the misplaced permits had been performed and that Reier had visited the premises but had failed to note on the field cards that the improvement had been completed. This conclusion is consistent with the testimony of Messrs. White, Norris and Burgeson [sic] presented at the April 17, 1997 hearing and the notations on the permits. Thus, I conclude that as of September 4, 1996, the SDAT had knowledge sufficient to order an investigation into whether Reier had been properly performing his field work. Accordingly, the termination notice of October 7, 1996 was beyond the thirty-day limit and must be rescinded.

With regard to Reier's request for benefits, in addition to an award of full back pay under § 11–110(d) of the State Personnel and Pension Article, ALJ Spencer found:

Having concluded that the Notice of Termination must be rescinded and in light of [§ 11–110(d) of the State Personnel

and Pension Article], I order that Reier be reinstated to his position of Assessor III with full back pay.

Reier requests that in addition to full back pay, I also order restoration of benefits, such as reimbursement for medical insurance, for the period of his termination. The applicable statute ... is written in the disjunctive. Thus, pursuant to the statute, I can rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; **OR** order reinstatement to the position that the employee held at dismissal or order full back pay **OR** order both, reinstatement and full back pay. (emphasis added) I have ordered that Reier be reinstated to the position that he held at the time of dismissal with full back pay. The statute does not provide for the restoration of benefits when reinstatement and full back pay are ordered. Pursuant to Md. State Pers. & Pen.Code Ann. § 2–601, a reinstated employee is entitled to the following:

§ 2–601. Reinstatement to State employment.

(c) Other benefits.—(1) A former nontemporary employee who is reinstated in a position in the State Personnel Management System shall receive credit of time employed before separation for the purpose of determining the employee's:

(i) step in the pay grade applicable to the employee's class

(ii) rate of annual leave accrual; and

(iii) seniority rights

Accordingly, Reier's request for the restoration of benefits pursuant to Md. State Pers. & Pen.Code Ann. § 11–110(d)(1)(ii) is denied.

SDAT requests that the award of back pay be reduced by interim earnings and the failure of Reier to mitigate damages. To support its position, SDAT uses the legislative history regarding House Bill 774 (Personnel Reform) from the 1996 Session of the General Assembly. However, the legislative history does not support the position of SDAT. In

the original bill, there was an offset and reduction for interim earnings from employment elsewhere or amounts earnable with reasonable diligence. 1996 Md. Laws, Chap[.] 347. This language would have been provided for the adjustment of back pay in a manner suggested by SDAT. However, this language was stricken from the bill and the current statute simply provides for "full back pay." Therefore, the award of back pay will not be offset or reduced.

### CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact and Discussion, I conclude as a matter of law that SDAT's termination of Reier must be rescinded. Md. State Pers. & Pen.Code Ann. § 11–106(b); *Western Correctional Institution, Department of Public Safety & Correctional Services v. Geiger,* 371 Md. 125, 144 [807 A.2d 32] (2002). I also conclude, as a matter of law, that Reier is entitled to reinstatement with full back pay. Md. State Pers. & Pen.Code Ann. § 11–110(d)(iii)(3).

### ORDER

Having concluded that the termination of Reier must be rescinded, I order that Reier be reinstated to his position as an Assessor III with full back pay.

Both parties timely petitioned the circuit court for judicial review of ALJ Spencer's decision. After conducting a hearing on March 17, 2005, the court ruled:

On appeal, SDAT argues that Judge Spencer erred in her decision of April 12, 2004 because in answering the two questions posed to her by the Court of Special Appeals she re-determined facts which had not been vacated. SDAT also argues that Judge Spencer erred in not holding another evidentiary hearing to hear evidence on these issues since significant evidence, which had previously been heard in front of another Administrative Law Judge had not been recorded. Interestingly, no objection was made at the proceeding before Judge Spencer on remand by SDAT for her failure to take additional testimony. At no time did

SDAT request to put on additional evidence or to reopen the evidentiary hearing.

This Court does not agree with the arguments posed by SDAT. The Court of Special Appeals remanded this instant case back to Judge Spencer with specific instructions for her to answer two specific questions. The Court of Special Appeals instructed Judge Spencer on the outcome of the case depending on how she answered these two questions. Judge Spencer did not err; she merely answered the questions posed to her by the Court of Special Appeals and based on her answers, reinstated Reier as the Court of Special Appeals instructed. This Court finds that there is substantial evidence in the record to support Judge Spencer's decisions.

On cross-appeal, Reier argues that Judge Spencer erred in reinstating him with back pay dating from October 7, 1996 but without any benefits. This Court agrees with Reier and therefore awards him benefits dating back from his wrongful termination on October 7, 1996. While SDAT argues that Section 11–110 of the State Personnel and Pension Article precludes these "benefits" as part of a reinstatement, this Court finds that it is inconsistent with the intent of the legislature. It is inconceivable that the legislature would have intended a wrongfully fired employee, when eventually reinstated for this wrongful termination, to only be entitled to their back pay and not other benefits, which the employee would have received absent the wrongful termination. This is not a logical result. Accordingly, this Court grants Reier benefits dating back to his October 7, 1996 termination.

The decision of the Administrative Law Judge is AFFIRMED and supplemented by the addition of benefits wrongfully withheld.

Appellant then filed a timely appeal to this Court.

## LEGAL ANALYSIS

SDAT argues that ALJ Spencer erred when she improperly re-decided "facts contrary to that which had already been

decided" at previous hearings before OAH. It points to the fact that when this matter was initially remanded by this Court, OAH was only authorized to apply the new standard set forth by the Court of Appeals' decision in *Geiger* for interpreting State Personnel and Pension § 11–106, and not to re-decide facts that were not vacated, or make new factual determinations, where OAH initially failed to make any determinations. SDAT also contends the ALJ abused her discretion by refusing the proffered evidence it offered upon remand, and then relying on certain evidence to decide the case, that the proffered evidence could have refuted. Lastly, SDAT claims the circuit court erred in its interpretation of State Personnel and Pension § 11–110, and its decision to reverse the decision of OAH and award appellee benefits, in addition to his award of full back pay after rescission of his termination.

## I

In the instant case, we are asked to review the decisions of ALJ Spencer and the circuit court's statutory interpretation. "In deciding whether the ALJ was correct, we stand in the same shoes as did the circuit court." *McKay v. Dep't of Public Safety,* 150 Md.App. 182, 192, 819 A.2d 1088 (2003)(citing *Gigeous v. Eastern Corr. Inst.,* 363 Md. 481, 495–95, 769 A.2d 912 (2001)). Because "administrative agency decisions are *prima facie* correct and carry a presumption of validity, we must review the [ ] decision in the light most favorable to that [agency]." *Cox v. Prince George's County,* 86 Md.App. 179, 187, 586 A.2d 43 (1991)(analogizing Tax Court decision review to that of administrative agency review). "We do 'not overturn the agency's factual findings or its application of law to facts if the decision is supported by substantial evidence considered in light of the record as a whole.'" *Id.* at 193, 586 A.2d 43 (citation omitted.) Furthermore, under this substantial evidence test:

... our inquiry is focused on whether evidence exists in the record from which a reasonable person could draw the same conclusion as the ALJ. In applying this test, however,

we "d[o] not substitute [our] judgment, even on the question of the appropriate inference to be drawn from the evidence, for that of the agency." Rather, we afford deference to the factual findings of the agency, as long as they are supported by the record.

*Dep't of Public Safety and Corr. Services v. Thomas,* 158 Md.App. 540, 551–52, 857 A.2d 638 (2004) (citations omitted).

■ In contradistinction to the substantial evidence test, "an arbitrary and capricious standard applies to our review of an agency's discretionary functions, making such actions essentially unreviewable '[a]s long as [the agency's] exercise of discretion does not violate regulations, statutes, common law principles, due process, and other constitutional requirements[.]' " *Id.* at 552, 857 A.2d 638 (quoting *Maryland State Police v. Zeigler,* 330 Md. 540, 557, 625 A.2d 914 (1993)).

## II

■ We conclude that the ALJ did not err in its factual determinations, which SDAT argues were previously determined. Judge Salmon, writing for the Court, vacated the judgment and ordered that the case be remanded, as a result of the Court of Appeals' rejection of our interpretation of § 11–106. In our first review of this case, we did not hold or order the vacation of the ALJ's factual findings. Our mandate, however, as well as the Court of Appeals' decision in *Geiger,* in effect, vacated those factual findings. The legal conclusion reached previously by ALJ Spencer was based upon our interpretation of § 11–106, which the Court of Appeals declared incorrect and reversed. In light of the Court of Appeals' decision, and per Judge Salmon's instructions, ALJ Spencer was to answer specific questions that would undoubtedly go to the merits of what the Court of Appeals declared agencies and appellate courts should seek in reviewing matters under § 11–106.

We agree with SDAT that an agency walks that fine line of *res judicata* when it engages in factual findings after one or two remands from appellate courts. We, nevertheless, dis-

agree that ALJ Spencer made erroneous factual findings in this case. Previously, Judge Salmon noted there were several facts that were not definitively determined by either ALJ in this case, or were not elicited in a manner that would form the basis upon which the Court could formulate a proper legal determination. Upon remand, the ALJ was to make a definitive determination as to when SDAT had adequate information to begin an investigation of Reier.

Patently, certain facts will remain unchanged, regardless of the legal principles applicable. ALJ Spencer's factual findings, or her reissuing certain findings, while making new determinations, was not error, considering the new legal principles to be applied to these facts. SDAT contends:

> The instant remand was not an opportunity for the ALJ to re-decide facts or to correct determinations that she now felt were erroneous, given that this Court did not vacate any previous finding of fact. Yet, OAH did not apply the Court of Appeals' *Geiger* standard to the existing findings of fact, but to facts improperly re-decided in a contrary manner. That is made abundantly clear by the fact that if one applied this Court's *Geiger* standard of due diligence to the ALJ's new fact-finding, one must reach a conclusion opposite of the January 3, 2001 OAH decision. If SDAT knew before September 4th that Reier had been to the permit properties and had not reported the new improvements (as determined in the second remand decision), how could due diligence not have triggered the 30–day period? Accordingly, the termination could not have been timely under this Court's *Geiger* standards. But that was not the decision that the ALJ made. Rather, she said that: "[i]f Management had not discovered that the Employee has not reported to the properties, that would have presented evidence that the Employee was not performing any of his duties and would have indicated the need for immediate investigation," but then concluded that "[i]t is clear from the evidence presented by Management in support of the charges that Management was not on notice of the misconduct that resulted in the charges until the audit began on September 9, 1996."

That initial conclusion by ALJ Spencer is clearly and indisputably inconsistent with her later answer to the second remand question.... Reier's new argument highlighting an old piece of evidence in a different way does not allow a redetermination of the facts for the same reason it would not allow a second grievance or a second appeal to be filed....

SDAT would be accurate if the legal standard had remained the same for both ALJ Spencer decisions. The primary distinction between the Court of Appeals' standard and our standard was that, in the first decision, the ALJ analyzed the evidence to find when SDAT *should have acquired sufficient knowledge to justify the imposition of a disciplinary sanction.* Under the Court of Appeals' interpretation, we then instructed ALJ Spencer to examine the evidence to determine when SDAT *acquired sufficient information to launch an investigation into Reier's work.* In the ALJ's second decision, she sought to discover evidence that would lead to an investigation, which could include minor inaccuracies or omissions, as opposed to determining whether Reier engaged in any misconduct to warrant discipline.

According to ALJ Spencer, September 4, 1996 became the critical day because that was the date listed on Management Exhibit number 9, a permit used by Burgesen, to re-assess Reier's work. As we noted before, the fact that SDAT became aware of information supporting its decision to launch an investigation was not previously determined by OAH. ALJ Spencer, however, on remand, makes this determination based upon the exhibit and testimony from White, Morris, and Burgesen. Utilizing the differing standards, and upon review of the facts, led the ALJ to different conclusions. Under our standard of review of the ALJ's decision after remand, a reasoning person could reach the same conclusion as the ALJ in this case.

Our review of that testimony reveals the time period White, Morris and Burgesen seem to agree upon is late August to the middle of September as the time they attempted to gather information on Reier. It appears, for purposes of answering

our questions, the scale tipped in favor of September 4th as the date for SDAT to acquire the knowledge to launch an investigation into Reier's employment practices. The affirmative answers to both our questions, as Judge Salmon earlier concluded, indicated Reier's termination, under the law, had to be rescinded. This same factual information may not have necessarily led to the conclusion under our initial standard—sufficient knowledge to justify imposing some form of discipline—in light of the fact that our initial standard implies an employee engaged in *any form* of misconduct may lead to disciplinary action, as opposed to an intermediary step of launching an investigation. Viewing the ALJ's decision on remand, as *prima facie* correct, we hold that the ALJ did not err in her factual determinations made under the applicable interpretation set forth by the Court of Appeals, and restated by this Court by way of questions.

## III

■ Because of the deference we afford administrative agencies for factual findings and their expertise, we determine ALJ Spencer did not abuse her discretion. Here, ALJ Spencer decided against additional evidence regarding testimony which was not recorded in 1997. During the first appeal to this Court, we remanded, in contemplation that the OAH would do all that would be necessary to definitively answer our questions. If that included making the requisite factual determinations, or examining new or clarifying evidence on remand, we are certain she would have done so. Our review of the ALJ's decision on remand reveals no abuse of discretion.

In reaching our decision, of critical importance were the dates and the running of days in this case. As Judge Salmon noted in the first appeal to this Court, the chronology of events suggested that some investigation of Reier's work occurred prior to September 3rd. This fact, however, was not definitively determined. In light of the Court of Appeals' enunciation of the proper interpretation OAH was to utilize in reviewing Reier's termination, whether SDAT had knowledge prior to September 7, 1996, had to be clearly set forth.

Given ALJ Spencer's prior experience with this case, and the voluminous record, it is not surprising that she decided no further testimony or evidence was necessary. Of note is that these events occurred in 1996; the ALJ did not start the remand process until October of 2003; she heard argument in March of 2004; and she entered her decision in April of 2004. The ALJ stated in her opinion that she found the testimony taken closest to the time of Reier's termination to be the most credible testimony. Assuming, *arguendo,* that ALJ Spencer accepted SDAT's proffered evidence to supplement the testimony regarding Burgesen's re-assessment in early September, she still could have reached the same conclusion that she reached without the additional evidence. Because we discern no legal error, nor abuse of discretion, we affirm the ALJ's decision, insofar as her answering this Court's questions on remand.

## IV

■■ Lastly, SDAT assigns error to the circuit court for reversing ALJ Spencer's decision interpreting State Personnel and Pension Article § 11–110(d). ALJ Spencer, after ruling Reier's termination was to be rescinded because SDAT did not comply with the 30–day requirement under 11–106, denied Reier's request for restored benefits, while reinstating him to his position with full back pay. ALJ Spencer also did not reduce the award by interim earnings or because Reier failed to mitigate damages, as SDAT requested. The circuit court concluded ALJ Spencer's interpretation was not what the General Assembly intended in drafting § 11–110, when employees are wrongfully terminated, and subsequently reinstated. The court failed to address the interim earnings finding. For the following reasons, we agree with ALJ Spencer and reverse the decision of the circuit court.

In respect to statutory interpretation and construction, as Chief Judge Bell has explained:

Repeatedly, we have emphasized that "the paramount object of statutory construction is the ascertainment and effectua-

tion of the real intention of the Legislature." In seeking to ascertain legislative intent, we first look to the words of the statute, viewing them "in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood." "Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." Nor may a court under those circumstances add or delete language so as to "reflect an intent not evidenced in that language," or construe the statute with " 'forced or subtle interpretations' that limit or extend its application."

Only when the statutory language is unclear and ambiguous, will courts look to other sources, such as the legislative history. We neither add words to, nor delete words from, a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature chose to use, and we do not engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. Moreover, whenever possible, the statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. And a statute is to be given a reasonable interpretation, not one that is illogical or incompatible with common sense.

We have acknowledged that in determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and, even when a statute is clear, its legislative history. We have cautioned, however, that this inquiry is "in the interest of completeness," "to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." That inquiry, in other words, we emphasized in *Chase,* "is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute." ("a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature.").

*Western Corr. Inst. v. Geiger*, 371 Md. 125, 140–43, 807 A.2d 32 (2002) (citations omitted).

The statute at issue here is Md.Code (1997 Repl.Vol., 2005 Supp.), State Pers. & Pens. § 11–110(d), which states:

(d)(1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:

(i) uphold the disciplinary action;

(ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or

(iii) order:

1. reinstatement to the position that the employee held at dismissal;

2. full back pay; or

3. both 1 and 2.

Our examination of the language of this statute leads us to conclude that the words are plain, and their meaning, unambiguous. The powers of an administrative law judge under these circumstances are limited to these actions, no more, no less. Upon an appeal to OAH, the judge may decide upon any of these actions. ALJ Spencer, emphasizing the legislature's use of "or," decided that due to the rescission of Reier's wrongful termination, he was entitled to both reinstatement and full back pay under subsection (d)(1)(iii)(3).

We reject the circuit court's reading of the subsection, or the statute as a whole, ascribing to that provision the intendment by the legislature to include benefits in the reinstatement of terminated employees receiving full back pay. A fair reading of section (d) indicates that the legislature granted the judge the power to restore benefits under a different option. The legislature could have placed that language under subsection (iii), but for its reasons, clearly did not. The court's interpretation amounts to a forced interpretation, which is impermissible under statutory construction principles.

Because of the unambiguous language of the statute, we are not required to look at the legislative history; we shall,

however, briefly address the interim earnings issue. When the General Assembly enacted the State Personnel Management System Reform Act of 1996, it sought to provide procedures for many issues significant to our analysis, specifically, disciplinary actions, termination and reinstatement. On the road to becoming an enrolled and enacted bill, there were only two provisions that were deleted from the drafts of subsection (d). The deletion of concern to us on this appeal is the omission from subsection (d)(1)(iii)(2) ordering full back pay, "... with a deduction for interim earnings from employment elsewhere or amounts earnable with reasonable diligence." The fact that the passage in quotation marks was deleted demonstrates the legislature's intent to award the wrongfully terminated employee back pay in its entirety. Although not considered by the court, we shall affirm the ALJ's finding concerning this issue.

This deletion also highlights the fact that the legislature used the term "pay" to mean monetary or financial earnings. The deleted passage mentions nothing of a possible deduction for interim benefit coverage that a terminated employee may have received from another employer between the period of termination and reinstatement. The deletion manifests the legislature's intent to separate awarding back pay from restoring benefits, as it does between subsections (ii) and (iii). Consequently, we reverse the circuit court's decision on this issue, and order the circuit court to issue a revised memorandum and order affirming the ALJ's reinstatement and award of full back pay for Reier.

## CONCLUSION

For the reasons stated herein, we affirm, in full, the decision of ALJ Spencer, and reverse only the circuit court's decision concerning the full back pay finding.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR MODIFICATION OF THE JUDGMENT BY AFFIRMING**

THE ORDER OF THE OFFICE OF ADMINISTRATIVE HEARINGS REGARDING FULL BACK PAY.

COSTS TO BE PAID BY APPELLANT.