915 A.2d 970

**David REIER**

v.

**STATE DEPARTMENT OF ASSESSMENTS AND TAXATION.**

**No. 29, Sept. Term., 2006.**

Court of Appeals of Maryland.

Feb. 5, 2007.

4

Hillary Galloway Davis (Davis & Associates Law Office, P.A. of Towson), on brief, for petitioner/cross respondent.

David M. Lyon, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, of Baltimore), on brief, for respondent/cross petitioner.

Argued before BELL, C.J., RAKER *, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

---

\* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

HARRELL, J.

The controversy presented in this case bounced back and forth between the Maryland Office of Administrative Hearings (OAH), the Circuit Court for Baltimore County, and the Court of Special Appeals over the past 10 years. The litigation began as an administrative appeal by David Reier from the State Department of Assessments and Taxation's (SDAT) termination of him as an Assessor III in its Carroll County office. The SDAT ceded authority to the OAH to conduct evidentiary hearings and render final administrative decisions in such personnel matters. The initial Administrative Law Judge (ALJ) at the OAH assigned to adjudicate Reier's appeal affirmed the validity of the termination upon a finding that Reier was given timely notice of his termination within 30 days of the SDAT's "discovering the depth of [his] misconduct and performance failure," pursuant to § 11–106(b) of the State Personnel and Pensions Article, Maryland Code (1993, 2004 Repl.Vol.).[1] The Circuit Court for Baltimore County, on Reier's petition for judicial review of the ALJ's decision, remanded the matter to the OAH. The court instructed the ALJ to reconsider her decision in light of the Court of Special Appeals's newly announced interpretation of § 11–106(b)'s 30 day notice requirement found in *Western Correctional Institute v. Geiger,* 130 Md.App. 562, 747 A.2d 697 (2000) *(Geiger I )*.[2] Aggrieved by the Remand Decision rendered by a different ALJ, Reier again sought judicial review in the Circuit Court, which affirmed the ALJ's decision. On appeal to the Court of Special Appeals *(Reier I)*, that court remanded the

---

1. Maryland Code (1993, 2004 Repl.Vol.), State Personnel and Pensions Article, § 11–106(b) requires that a state entity with the authority to hire and fire employees may take disciplinary action towards an employee "no later than 30 days after the [entity] acquires knowledge of the misconduct for which the disciplinary action is imposed."

2. In that case, the Court of Special Appeals held that a covered state agency "is prohibited from imposing disciplinary action more than 30 days after it has acquired—or, with the exercise of reasonable diligence, should have acquired—knowledge sufficient to justify taking disciplinary action against the employee." *Western Corr. Inst. v. Geiger,* 130 Md.App. 562, 566, 747 A.2d 697, 699 (2000) *(Geiger I).*

case to the OAH to apply the yet newer judicial gloss given the 30 day notice standard announced in this Court's *Western Correctional Institute v. Geiger*, 371 Md. 125, 807 A.2d 32 (2000) *(Geiger II)*.[3]

The same ALJ undertook this case for a third time and, after rendering factual findings varying as to some key dates from her previous findings, determined that more than 30 days passed between when the SDAT became aware of facts sufficient to prompt an investigation into Reier's job performance and the termination. The ALJ thus ordered that Reier be reinstated and awarded back pay, consisting only of lost monetary wages. Both the SDAT and Reier turned again to the Circuit Court: the SDAT disputing the new factual finding that its managers in the Carroll County office were aware of Reier's asserted poor performance for more than 30 days before Reier was terminated, and Reier arguing that it was error to exclude from the back pay award benefits and the other accoutrements of State employment. The Circuit Court affirmed Reier's reinstatement and directed that he be awarded benefits as part of his back pay. On appeal by the SDAT, the Court of Special Appeals affirmed Reier's reinstatement, but concluded that back pay was limited to wages and did not include benefits. *Dep't of Taxation v. Reier*, 167 Md.App. 559, 597, 893 A.2d 1195, 1218 (2006) *(Reier II)*. We are asked, at this point, on cross-petitions for *certiorari*, to resolve two questions. We are called upon by the SDAT to decide whether the ALJ, in applying the *Geiger II* notice standard, erred in reformulating the factual findings concerning the point in time when the SD AT became sufficiently aware of Reier's misconduct and poor performance to trigger the statutory investigation and disciplinary action period. We also consider, upon Reier's petition, whether the phrase "full back pay", as it is

---

3. We held that "viewed in context, § 11--106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action and give notice to the employee of the disciplinary action taken." *Western Corr. Inst. v. Geiger*, 371 Md. 125, 145–46, 807 A.2d 32, 44 (2000) *(Geiger II)*.

used in Maryland Code (1993, 2004 Repl.Vol.), State Personnel and Pensions Article, § 11–110(d)(1)(iii),[4] encompasses other State-offered benefits such as medical, dental, and life insurance; leave; and retirement credit.

## I. FACTS

David Reier, until his termination on 7 October 1996, was employed as an Assessor III for the SDAT office in Carroll County. As an assessor, Reier was expected to conduct assessments of real property "accounts", or individual properties, assigned to him by his superiors, to establish their fair market value for taxation purposes. A typical assessment would entail a preliminary review of building permits for each property, editing the computer database corresponding to each property (referred to as a Computer Assisted Mass Appraisal ("CAMA")), reviewing and noting comparable sales data, conducting an external physical inspection of each property, measuring new improvements, and speaking with the homeowner or appropriate adult occupant of a given property. This process is commonly referred to as an assessor's "field-work". The SDAT conducts assessments on a triennial cycle, completing assessments or re-assessments of one-third of the State's taxable properties each year of the cycle. The SDAT generally strives to finish this task each year prior to 1 October in anticipation of the assessment notices being dispatched on 1 January of the following year. Before the process is considered complete, however, local supervisors

---

4. State Personnel and Pensions Article § 11–110, at the time of the instant action, provided, in pertinent part:

 (d) *Additional action by Office of Administrative Hearings; final administrative decision.*—(1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:
 (i) uphold the disciplinary action;
 (ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or
 (iii) order:
 1. reinstatement to the position that the employee held at dismissal;
 2. full back pay; or
 3. both 1 and 2.

typically carry out field audits of its assessors for quality control purposes. This auditing process generally does not commence for a given assessor until after the assessor reports that he or she has completed all of his or her field work for all assigned property accounts.

The events leading up to Reier's termination occurred during the final months of the 1996 assessment year. In early August 1996, the Assistant Supervisor of Assessments for Carroll County, Lumen Norris,[5] found a stack of 8 to 10 building permits on top of, or otherwise in close proximity to, a filing cabinet designated for the storage of such permits. This caught Norris's attention because assessors ordinarily commence their field work by locating and extracting from the cabinet permits linked to their assigned properties by account number so that the progress of any new construction may be evaluated properly. If permits were not in their proper place, filed in the cabinet, as was the case here, it may indicate that they were not being considered in the assessment process. Norris identified the misplaced permits by their account numbers as linked to properties assigned to Reier. Shortly after his discovery, Norris brought the misplaced permits to the attention of the Supervisor of Assessments for Carroll County, Larry White, during a discussion about quality control and the pending field audits. White decided to use the permits as a sampling of Reier's work for audit purposes.

The timeline of the particular audit of Reier's work, as one may imagine, is a source of considerable dispute in this record because of its significance to the determination of the date on which SDAT became aware of the extent of Reier's asserted poor performance and misconduct. Because Reier was terminated on 7 October 1996, a finding that the SDAT was aware of Reier's deficient work prior to 7 September 1996 would render the discipline untimely under the *Geiger II* standard

---

**5.** Mr. Norris, evidently, is known also as William F. Norris, Jr., according to the record. Because the ALJ's findings of fact and the brief prepared by the SDAT, Norris's employer, refer to his given name as "Lumen", we shall use that name.

for calculating the 30 day period in which the State as an employer has to investigate and effectuate discipline. As noted earlier, there was a divergence of findings on this point between the first and second remand hearings at the OAH. We shall explore these findings in greater detail *infra.*

The remainder of the factual background is uncontested. On 13 September 1996, White met with the State Supervisor of the SDAT, Joseph Szabo, and Personnel Administrator, Emory Rudy, about Reier's performance as an assessor. On 24 September 1996, Assessor Supervisor Gail Trawinski of the Carroll County office reported the findings of her review of Reier's "edits"[6] of properties that recently had been sold.[7] Her initial review uncovered 21 errors in Reier's editing of 68 properties.[8] Trawinski's subsequent review of 300 other edits performed by Reier yielded a finding of 87 mistakes. Trawinski communicated her findings to White in late September. Around that same time, the SDAT headquarters dispatched Assessor Manager, Joseph Wagner, to audit Reier's work. Upon a drive-through of the geographical area containing the properties assigned to Reier, Wagner identified 24 properties exhibiting visible, new improvements that had been present for more than one month. Wagner determined that, of the 24, Reier's fieldwork correctly noted improvements on one account, incorrectly noted five, and entirely missed improvements on 18 properties.

Satisfied that the audit established thoroughly the pervasiveness and unacceptable frequency of Reier's assessment

---

6. An "edit" is essentially an updating of the previous information on the CAMA database, which also affords an opportunity to verify the accuracy of that information.

7. Reviewing the assessments of recently sold properties is of particular importance to quality control because it provides a market-based appraisal of the accuracy of the SDAT's assessment methods and valuations.

8. This finding was compared by the SDAT to zero errors found in the editing performed by two other Carroll County assessors who had 22 and 6 properties reviewed, respectively.

errors,[9] White convened a meeting with Reier on 3 October 1996 to discuss the audit's findings and determine the appropriate sanction. White terminated Reier after weighing Reier's previously satisfactory job performance evaluation against the recent audit results and Reier's unsatisfactory explanation of the audit results.

## II. PROCEDURAL HISTORY— A CLOSER EXAMINATION

After 10 years of litigation, the procedural history of this case is admittedly protracted. We commence our close review of this history necessarily with the first remand to the OAH because it resulted in the pertinent factual findings later revised in the course of the second remand.

### OAH Remand Decision I (8 December 2000)

As a result of the Court of Special Appeals's decision in *Geiger I*, the Circuit Court for Baltimore County remanded Reier's appeal to the OAH for more detailed findings of fact pertaining to the SDAT's actions after the initial discovery of the out-of-place building permits. The court, quoting the standard from *Geiger I*, requested that the ALJ determine "the date by which SDAT '. . . in the exercise of reasonable diligence, should reasonably have acquired enough knowledge' to justify terminating Reier on October 7, 1996." Of specific interest to the court was how long it took Norris to investigate the misplaced permits and "discover the misconduct that they evidenced," as well as whether the review of Reier's work that transpired in "early September" occurred before 6 September 1996.

In response to the Circuit Court's order, ALJ Sondra Spencer conducted a new hearing and accepted additional evidence from both parties, along with the record from the initial OAH hearing. The findings of fact in ALJ Spencer's

---

**9.** Reier had challenged below the adequacy of the SDAT's basis for terminating his employment. Reier does not pursue that contention here.

resultant decision, responsive to the Circuit Court order, were as follows:

3. In early August 1996, Lumen Norris, Assistant Supervisor of Assessments for Carroll County, found a stack of 8 to 10 building permits on a cabinet. There were no notations of [sic] the permits. The properties reflected on the permits were assigned to the Employee.

4. Mr. Norris discussed the permits with Larry White, Supervisor of Assessments for Carroll County. Mr. Norris and Mr. White took the permits and went to the properties to determine if work had been performed pursuant to the permits. They discovered that the Employee had been to the properties but had not made any notations on the permits.

5. On September 3, 1996, the Employee completed his fieldwork.

6. As part of a quality control review, once an assessor completes his fieldwork, Mr. White conducts a random audit of the assessor's work.

7. On September 9, 1996, Mr. White conducted a field audit of the Employee's completed fieldwork. The assessments for 68 properties were reviewed and 21 errors, which affected property valuations, were discovered.

8. Between September 14 and September 30, at least three more audits of the Employee's work were conducted. One of the audits revealed 87 out of a total of 300 properties with errors affecting evaluation. Another audit reviewed the fieldwork on 33 properties. Of the 24 properties with changes from previous assessments, the Employee accurately reflected one change, incorrectly noted five changes that he identified[,] and failed to reflect 18 changes, including decks and additional buildings on the properties.

Upon these findings of fact, the ALJ concluded that Reier had not made a *prima facie* showing that the SDAT was on notice of his misconduct to an extent that would justify

discipline more than 30 days prior to the actual termination. Even though Norris and White were aware of the misplaced permits and the errors evidenced by Reier's failure to note the relevant real property improvements, ALJ Spencer found that such knowledge did not rise to the level needed to justify terminating Reier's employment.[10] Further, because Reier had not completed his field work at that time, it was n ot yet incumbent upon Norris or White to conduct their audit of Reier's work. The ALJ determined that the SDAT was put on notice of Reier's misconduct, to an extent sufficient to trigger commencement of the time period prescribed in § 11–106(b), only after Norris and White's 9 September 1996 audit of 68 of Reier's assigned properties, thus making the 7 October 1996 termination timely.[11] Reier sought judicial review of the AL J's decision in the Circuit Court.

### Circuit Court Review (31 December 2001)

The Circuit Court judge affirmed the ALJ's decision in favor of the SDAT under the deferential "substantial evidence" standard of review. The court dismissed Reier's argument that the discovery of the misplaced permits was sufficient to trigger the 30 day period under § 11–106(b). Commenting on Reier's position, the court stated "[w]ere the Court to adopt this approach, State agencies would have to launch a full scale investigation every time a supervisor discovered that an employee failed to put away documents used by the employee in performing his job." Reier appealed this decision to the Court of Special Appeals.

---

**10.** The ALJ explained that the errors pertaining to the non-annotated permits did not necessarily indicate that Reier was not visiting any properties at all, which "would have indicated the need for an immediate investigation." Rather, it was only enough information to indicate that Reier may have been performing his duties poorly, which, in the judgment of the ALJ, apparently would not have been significant enough to prompt a more immediate investigation.

**11.** The ALJ seemed to emphasize the numerical difference between the 8 to 10 permits initially discovered and the 68 properties audited as a basis for her decision that the discovery of the permits was not sufficient to trigger the termination.

*Court of Special Appeals Remand (19 December 2002)*

The Court of Special Appeals, in an unreported opinion filed on 19 December 2002, weighed in on the 30 day notice provision of § 11–106(b), taking into account our opinion in *Geiger II*. The intermediate appellate court identified its task as deciding "[w]hen did the [SDAT] acquire knowledge sufficient to order an investigation of the conduct that ultimately resulted in the termination of [Reier]." The appellate court panel prefaced its review of the procedural history and facts of the case by noting that if the SDAT acquired adequate notice in early August 1996, as alleged by Reier, the termination would have to be rescinded. Obfuscating the court's analysis of the question before it, however, was the fact that

> the chronology set forth [by the ALJ's factual findings] suggests—but does not definitively establish—that prior to September 3, 1996, Messrs. Norris and White went to the property *[sic]* mentioned on the mislaid permits and discovered that Reier had not noted the improvements on the permits even though he had claimed to have been on the premises.[12]

If Norris or White actually had checked Reier's field cards to determine if he had noted any of the improvements after Reier had claimed to have visited the properties, the panel hypothecated, then Reier's supervisors would have possessed, at that point, sufficient knowledge to investigate Reier for derogation of his duties. Because this realization would have occurred before Reier reported that his field work was complete on 3 September 1996, the 7 October termination would have fallen outside of the statutorily prescribed 30 day period for the proper administration of the statutory investigative and disciplinary processes in this case. The Court of Special Appeals ultimately resolved that it could not so conclude

---

12. The reason for this inference is an assumption that the findings of fact were presented in chronological order. Thus, when the ALJ noted the discovery of the permits and the field audit by Norris and White in the numbered paragraph just prior to the entry reciting that Reier had completed his field work on 3 September 1996, it appeared that the entire permit episode pre-dated Reier's completion of his field work.

because neither the initial ALJ, M. Gayle Hafner, nor ALJ Spencer made an explicit determination of when Norris or White examined Reier's field cards.

Because of the ambiguous chronology established in the earlier administrative decisions, the appellate court panel noted that the facts as found, when alternatively viewed in a light most favorable to either party, would allow either party to prevail. The court noted that it was possible to conclude that Norris and White, prior to 3 September 1996, were aware of Reier's omission from the field cards of the improvements described in the misplaced building permits and that Jack Burgesen, another assessor in the Carroll County office, had audited one of Reier's assigned properties, at White's direction, on 4 September. Conversely, the record also supported a contrary conclusion that Norris and White only became aware of Reier's deficient performance upon their field inspection of the building permit properties on 9 September 1996. The intermediate appellate court opined that

> the date that SDAT acquired knowledge sufficient to order an investigation into whether Reier had been properly performing his field work was when the employer discovered (1) that improvements (mentioned on the misplace[d] permits) had been performed and (2) that Reier had visited the premises but had failed to note on SDAT's field cards that the improvements had been completed.

The ambiguity of the ALJ's fact findings, however, did not determine with certainty when the critical knowledge noted above was acquired by the SDAT. Accordingly, the court remanded the case for a determination by the ALJ whether the SDAT acquired the critical knowledge prior to 7 September 1996, which, if so, would require rescission of Reier's termination.

*OAH Remand Decision II (12 April 2004)*

Upon remand, ALJ Spencer reconsidered the evidence adduced thus far, declining the SDAT's request to supplement the record further with additional testimony on the questions posed by the Court of Special Appeals. The ALJ recited her

previous findings of fact from the first remand decision, along with a critical revision of finding number four [13]:

As a result of the remand order and further review of the record, I find the following additional facts:

11. Mr. Norris found a stack of misplaced permits in August 1996. There were no notations of the permits that the property had been assessed or visited. Upon further checking, Mr. Norris concluded that the properties had been assigned to Reier.

12. After finding the field cards, Mr. Norris pulled the field cards to determine if Reier had been to the properties. The notation on the field cards indicated Reier had been to the properties.

13. Mr. Norris discussed his findings with Mr. White. Both Mr. Norris and Mr. White then went to the properties identified in the permits.

14. Mr. White next instructed Jack Burgeson [sic], another assessor, to reassess the properties.

15. Mr. Burgeson [sic] conducted reassessments on September 4, 1996, September 14, 1996, and September 30, 1996.

(footnotes omitted).

ALJ Spencer recast the chronology relying on the testimony taken during the 17 April 1997 hearing, rather than testimony received on 7 May at the initial OAH proceeding presided over by ALJ Hafner. She found that the April testimony was "more credible and accurately reflect[ed] the chronology of events in this case," [14] which now resolved that the SDAT

---

13. Finding number four, which preceded the finding that Reier had completed his field work on 3 September 1996, stated: "Mr. Norris discussed the permits with Larry White, Supervisor of Assessments for Carroll County. Mr. Norris and Mr. White took the permits and went to the properties to determine if work had been performed pursuant to the permits. They discovered that the Employee had been to the properties but had not made any notations on the permits."

14. The ALJ's determination of credibility is owing to the fact that White changed his testimony twice during the 7 May hearing as to when he

acquired knowledge sufficient to trigger an investigation of Reier's job performance by 4 September 1996. The judge relied upon Norris's 17 April testimony that, after finding the misplaced permits, he reviewed the corresponding field cards, which led him to discuss the matter with White. The two then visited the properties to which the permits corresponded and discovered that Reier had not noted on the field cards the completed improvements located on the properties, despite his indication that he had visited the properties. This realization prompted White to order Burgesen to reassess those properties, which task Burgesen commenced on 4 September 1996, as evidenced by his notation of that date on one of the misplaced permits. ALJ Spencer further noted that Burgesen had to have possessed the field cards to conduct his reassessment of the properties, providing further evidence that the SDAT was cognizant of Reier's poor performance prior to the critical date of 7 September 1996. Accordingly, the ALJ rescinded the termination as untimely.

ALJ Spencer then considered the question of whether State-offered benefits are contemplated as part of the "full back pay" remedy provided in § 11–110(d)(1) [15] for a rescinded termination. In her view, § 11–1 10(d)(1) was framed in the disjunctive, thus providing three mutually exclusive possible outcomes to an employee's appeal of his or her termination: (1) affirmation of the discipline, (2) rescission or modification of the discipline and the restoration of pay and the full panoply of state benefits, *or* (3) reinstatement, full back pay, or both. The ALJ thus reasoned that the statute foreclosed the possibility of both reinstatement with full back pay *and* the award of benefits. Accordingly, Reier was reinstated with

---

inspected the properties implicated by the misplaced permits. Before settling on 9 September 1996 as the day he checked the properties, he first testified he saw them on 2 September, which was a State holiday (Labor Day), and then that he visited them on 7 September, which was a weekend day.

**15.** Unless otherwise noted, citations in this opinion to the Maryland Code are all to various provision of the State Personnel and Pensions Article.

full back pay, but not restored with lost state benefits. Both Reier and the SDAT sought judicial review of the decision.

### Circuit Court Review (18 March 2005)

The SDAT assigned error to the ALJ for not permitting the admission of additional evidence on the questions posed by the Court of Special Appeals in *Reier I* and to the ALJ's revision of her previous findings of fact. Reier, on the other hand, argued that the ALJ incorrectly concluded that State-offered benefits may not accompany an award of full back pay. Finding that the ALJ properly made supplemental findings of fact in response to the Court of Special Appeals's specific inquiries, the Circuit Court affirmed the administrative decision concluding Reier's termination to be unlawful. The court also concluded that it would defy logic to construe § 11–110(d)(1) as precluding benefits as part of a full back pay award for a wrongful termination. The SDAT appealed this judgment.

### Court of Special Appeals's Review (3 March 2006)

The Court of Special Appeals affirmed the reinstatement of Reier, finding that its previous unreported opinion in this case and *Geiger II* effectively vacated ALJ Spencer's original findings of fact. *Reier II,* 167 Md.App. at 591, 893 A.2d at 1215. The intermediate appellate court perceived that it was incumbent upon ALJ Spencer to make new factual findings to "answer specific questions that would undoubtedly go to the merits of what the Court of Appeals declared agencies and appellate courts should seek in reviewing matters under § 11–106." *Id.* The new factual determinations were not made in error because "new legal principles [were] to be applied to these facts." *Reier II,* 167 Md.App. at 592, 893 A.2d at 1215. Because the resolution of the case under the *Geiger I* standard did not implicate as relevant facts pertaining to when the SDAT became aware of circumstances justifying an investigation of Reier, the resolution of the case under the *Geiger II* standard necessitated new findings of fact. *Reier II,* 167 Md.App. at 593–94, 893 A.2d at 1216. It was within the ALJ's

discretion whether to accept further evidence from the SDAT on the questions posed by the Court of Special Appeals's remand opinion. *Reier II,* 167 Md.App. at 594–95, 893 A.2d at 1216–17.

Finally, the appellate court panel reversed the Circuit Court on the issue of benefits, holding that the plain language of § 11–110(d)(1) precluded the award of benefits in addition to full back pay. The General Assembly drafted the statute to restore benefits in the event of the rescission or modification of a disciplinary action in subsubsubsection (ii), but not in conjunction with full back pay as provided in subsubsubsection (iii). The intermediate appellate court reasoned that if the Legislature intended for benefits to be available in addition to full back pay, the statute would have been framed more clearly to so provide. *Reier II,* 167 Md.App. at 597, 893 A.2d at 1218.

## III. DISCUSSION

### A. The Revised Factual Findings

The SDAT renews here its assignment of error to ALJ Spencer's decision for her revision of the timeline findings pertaining to its notice of Reier's deficient performance as an assessor. Specifically, the SDAT argues initially that the law of the case doctrine forbade the ALJ from revising her previous findings of fact in this regard. The findings of fact made on the first remand to OAH supported ALJ Spencer's conclusion at that time that the SDAT was not on adequate notice of Reier's misconduct until 9 September 1996. This conclusion, as the SDAT's theory goes, is readily applicable to either the *Geiger I* or *Geiger II* standard, without the need for revisiting the fact-finding function. Thus, the ALJ over-reached her authority in answering the Court o f Special Appeals's questions of clarification in *Reier I* by reformulating the timeline of events which previously had been affirmed by the Circuit Court as supported by substantial evidence.

Illustrative of this overreaching, the SDAT observes that if the revised findings were in place for the first remand decision

applying the *Geiger I* standard, the ALJ would have had to come to a different conclusion than was reached in reliance on the findings of fact actually made in that decision. The SDAT asserts that Reier's termination would have been justified, and the 30 day "clock" would have begun to run had the SDAT known prior to 4 September 1996 that Reier failed to note and record the improvements evident at the properties he claimed to have visited. Notably, ALJ Spencer did not arrive at that conclusion in her first remand decision, but instead found that the SDAT was not aware sufficiently of Reier's possible misconduct, and thus the 30 day "clock" would not have begun to run, until 9 September 1996. The SDAT argues that when the Court of Special Appeals in *Reier I* sustained the finding that Norris and White conducted the audit on 9 September, such became the law of the case and could not be revised at the subsequent administrative hearing on remand to the OAH.

Reier counters that the ALJ merely was answering the questions posed by the Court of Special Appeals in *Reier I* because of the ambiguity noted by that court in her findings of fact in the 8 December 2000 remand decision.[16] Because it was not entirely clear when the SDAT became aware sufficiently of Reier's misconduct, the Court of Special Appeals remanded the case to the ALJ for clarification. Thus, the ALJ did not exceed her authority in making the findings, revised though they were.

 The "law of the case doctrine is one of appellate procedure." *Scott v. State*, 379 Md. 170, 183, 840 A.2d 715,

---

16. The intermediate appellate court framed its request for clarification thusly:

> Upon remand, the ALJ shall answer the following question: When did SDAT acquire information sufficient to launch an investigation into whether Reier's work performance was 'negligent, incompetent, and inefficient.' The ALJ should also answer the following subsidiary questions: Did SDAT's agents go to the premises (mentioned in the misplaced permits) prior to September 7, 1996, to determine if the improvements mentioned in the permits had been completed? If the answer to that question is 'yes,' did SDAT know prior to September 7, 1996, that Reier had been to the premises (mentioned in the misplaced permits) but had failed to note on the field cards the fact that improvements to the property had been made?

723 (2004) (quoting *Goldstein & Baron Chartered v. Chesley,* 375 Md. 244, 253, 825 A.2d 985, 990 (2003)). "Under the doctrine, once an appellate court rules upon a question presented on appeal, litigants and lower courts become bound by the ruling, which is considered to be the law of the case." *Id.* (citing *Turner v. Hous. Auth.,* 364 Md. 24, 32, 770 A.2d 671, 676 (2001)). The function of the doctrine is to prevent piecemeal litigation. *Fid.-Balt. Nat'l Bank & Trust Co. v. John Hancock Mut. Life Ins. Co.,* 217 Md. 367, 371–72, 142 A.2d 796, 798 (1958). Thus, litigants

cannot prosecute successive appeals in a case that raises the same questions that have been previously decided by this Court in a former appeal of that same case; and, furthermore, they cannot, on the subsequent appeal of the same case raise any question that could have been presented in the previous appeal on the then state of the record, as it existed in the court of original jurisdiction. If this were not so, any party to a suit could institute as many successive appeals as the fiction of his imagination could produce new reasons to assign as to why his side of the case should prevail, and the litigation would never terminate. Once this Court has ruled upon a question properly presented on an appeal, or, if the ruling be contrary to a question that could have been raised and argued in that appeal on the then state of the record, as aforesaid, such a ruling becomes the 'law of the case' and is binding on the litigants and the court alike, unless changed or modified after reargument, and neither the questions decided not the ones that could have been raised and decided are available to be raised in a subsequent appeal.

*Fid.-Balt. Nat'l Bank & Trust Co.,* 217 Md. at 372, 142 A.2d at 798. It appears to us, however, that the doctrine of the law of the case, in its proper application, concerns appellate conclusions as to questions of law, not pure questions of fact. *Stokes v. Am. Airlines, Inc.,* 142 Md.App. 440, 446, 790 A.2d 699, 702 (2002) (citing *Turner,* 364 Md. at 31–33, 770 A.2d at 676–77 and *Hagez v. State,* 131 Md.App. 402, 418–19, 749 A.2d 206, 214–15 (2000)) ("Once an appellate court has answered a

*question of law* in a given case, the issue is settled for all future proceedings.") (emphasis added), *cert. denied,* 369 Md. 179, 798 A.2d 552 (2002); *see also, e.g, Corby v. McCarthy,* 154 Md.App. 446, 480–81, 840 A.2d 188, 208 (2003) ("The important issue of whether the Guidelines apply in calculating support for a destitute adult child is a *question of law,* which was certainly resolved as to these parties and their child in *McCarthy I* for purposes of law of the case.") (emphasis added); *Barrett v. Lohmuller Bldg. Co. of Baltimore City,* 151 Md. 133, 139, 134 A. 37, 39 (1926) (quoting 4 Corpus Juris § 3088, p. 1106) ("As a general rule the doctrine of the 'law of the case' applies to all *questions of law* identical with those on the prior appeal, and on the same facts, *and to* such questions only. The doctrine is rarely, and in a very limited class of cases, applied to matters of evidence as distinguished from rulings of law, and a decision on appeal on a question of fact does not generally become the law of the case, nor estop the parties on a second trial from showing the true state of the facts.") (emphasis added); 2A FED. PROC, L. ED. § 3:793, p. 542 ("The doctrine applies to determinations only of questions of law and not questions of fact."). Although factual determinations undergirding or mixed with conclusions of law may become the law of the case,[17] pure matters of fact, absent commingling with the application of legal principles, have no estoppel effect under the law of the case doctrine. *Barrett,* 151 Md. at 139, 134 A. at 39.

 The doctrine of the law of the case is inapplicable here. The Court of Special Appeals in *Reier I* reached no definitive conclusion with regard to the point in time at which the SDAT possessed knowledge sufficient to commence an investigation

---

17. *See, e.g., Beane v. Prince George's County,* 20 Md.App. 383, 389 n. 2, 315 A.2d 777, 780 n. 2 (1974) ("The Court here cited *Grant v. Katson,* [261 Md. 112, 274 A.2d 88 (1971)] where the findings of fact inherent in the jury's general verdict returned at the close of plaintiffs' action for continuing trespass arising from alleged excessive concentration and diversion of surface waters, and the conclusion as to liability, were deemed by the court to 'constitute the law of the case' in a determination of whether ancillary injunctive relief was appropriate.' ") (citation omitted).

of Reier. In fact, to the extent that the *Reier I* panel discussed findings of fact, it specifically stated that it could not render legal conclusions based on the extant fact-finding because of the ambiguity of the factual findings made by the ALJs to that point. This is also true with respect to the legal significance of the date of 9 September 1996, cited by the SDAT as the critical day on which Norris and White conducted a "field audit" of Reier's misplaced permit properties and discovered the extent of his misconduct sufficient to warrant an investigation. Because of the ordering and phrasing of the ALJ's findings, the *Reier I* court expressed its misgivings about whether this "field audit" was merely of the properties that were the subject of the misplaced permits *or a more extensive review of 68 properties.*[18] Thus, even if the doctrine of the law of the case were implicated by findings of fact, the *Reier I* court expressly declined to commit or opine as to any such findings, much less a version supporting the SDAT's position.

The SDAT's reliance on *Stavely v. State Farm Mutual Automobile Insurance Co.,* 376 Md. 108, 829 A.2d 265 (2003), as support for its "law of the case" argument is misplaced. In *Stavely,* an ALJ determined that an insurer's proposed nonrenewal of an automobile liability policy was not justified and, therefore, violated Maryland law. 376 Md. at 115, 829 A.2d at 269. The ALJ's legal conclusion was upheld by the Court of Special Appeals and the Court of Appeals denied *certiorari. Id.* Another ALJ presiding over the same case subsequently for purposes of determining an award of attorney's fees held, notwithstanding the previous final disposition on the issue, that the insurer was justified in not renewing the policy. *Id.* Upon subsequent judicial review, the *Stavely* Court concluded that this revisitation of the nonrenewal justification issue was

---

18. The resolution of this ambiguity was critical. If the 9 September "field audit" were merely of the subject properties of the permits, the SDAT would have acquired the requisite knowledge to terminate Reier within 30 days of his actual termination—making the discipline timely. On the other hand, had the 9 September audit been of the 68 properties, thus implying that the permit properties had been reviewed by the SDAT prior to 7 September, the discipline would have been untimely.

contrary to the doctrine of the law of the case and/or principles of *res judicata.* 376 Md. at 116–17, 829 A.2d at 270. The SDAT incorrectly imagines *Stavely* as presenting a scenario similar to what transpired in the present case. First, as we have noted previously, the doctrine of the law of the case does not apply here because no legal conclusions were reached by the *Reier I* court, unlike in *Stavely.* Second, the sequence of events in *Stavely* was not complicated, as here, by an intervening change in a legal standard relevant to the disposition of the case, which required a revisitation and reformulation of relevant fact-finding as previously addressed.[19]

The SDAT, however, claims that "the *Reier I* decision never vacated any facts although it sought clarification of certain events in the sequence." The SDAT here emphasizes only half of the story. The findings made by the ALJ remained intact to the extent that the Court of Special Appeals did not express doubt as to their precision. Notably, the intermediate appellate court indicated in *Reier I* that it was remanding the case for the ALJ to answer specific questions regarding the acquisition by the SDAT of knowledge of Reier's poor performance and misconduct precisely because of the imprecision of certain factual findings made earlier. The mandate in *Reier I* vacated the judgments below and instructed the ALJ to conduct "further proceedings in conformity with the views set forth in this opinion,"[20] which the ALJ dutifully carried out by answering the questions posed. *See Harrison v.*

---

19. The real problem, as the Court of Special Appeals noted in *Reier I,* was that the previous findings of fact were insufficient to answer the new questions posed by the intervening new interpretation of the 30 day notice standard introduced by *Geiger II.* "It is well settled that the law of the case doctrine does not apply when ... controlling authority has since made a contrary decision on the law applicable to such issues...." *Turner v. Hous. Auth.,* 364 Md. 24, 34, 770 A.2d 671, 677 (2001).

20. The judgment was vacated and, thus, became void. *Walter v. Gunter,* 367 Md. 386, 395 n. 8, 788 A.2d 609, 614 n. 8 (2002) ("To vacate is '[t]o render an act void; as, to vacate an entry of record, or a judgment.' Clearly upon vacating a paternity declaration, it no longer exists or has legal force.") (citation omitted); *Young v. Progressive Cas. Ins. Co.,* 108 Md.App. 233, 240, 671 A.2d 515, 518 (1996).

*Harrison,* 109 Md.App. 652, 666, 675 A.2d 1003, 1010 (1996) ("[A]ny direction in an order or mandate that proceedings on remand are to be consistent with the opinion would necessarily require the opinion to be considered as an integral part of the judgment."), *cert. denied,* 343 Md. 564, 683 A.2d 177. Although the opinion in *Reier I* was silent on the question of whether new or revised factual findings were required to satisfy its queries, it is presumed that the ALJ possessed the discretion to carry out the mandate in whatever manner she best saw fit. *See Balducci v. Eberly,* 304 Md. 664, 670, 500 A.2d 1042, 1046 (1985). We, thus, reject the SDAT's argument that ALJ Spencer overreached her authority by making revised findings. Rather, the revision of the previous findings was amply within the ambit of the remand and fulfilled the tasks set before her by the *Reier I* mandate and opinion.

█ Because we believe that it was proper to permit Reier and the SDAT to argue the facts and the ALJ to reevaluate them in light of the *Geiger II* interpretation of the § 11–106(b) notice standard, we agree with the Court of Special Appeals's determination of the untimeliness of Reier's termination. Further, ALJ Spencer did not abuse her discretion by advising the parties in a 24 October 2003 letter that she would not accept further evidence proffered by the SDAT prior to oral arguments at the second remand hearing. The ALJ's decision to forego the receipt of possible further evidence is entitled to deference and may only be reversed if found to be arbitrary and capricious.[21] We are convinced further that ALJ Spencer's decision regarding the need for additional evidence was reasonable given the reality that, just prior to the remand, she re-acquainted herself with the arguments and voluminous

---

**21.** We have held previously that the arbitrary and capricious standard applies to an administrative agency's decision to reopen a hearing after it had completed the receipt of evidence and begun deliberations on the matter. *Spencer v. Bd. of Pharmacy,* 380 Md. 515, 530–31, 846 A.2d 341, 350 (2004) (citing *Md. State Police v. Zeigler,* 330 Md. 540, 557–58, 625 A.2d 914, 922–23 (1993), in turn citing Maryland Code (1984, 1993 Repl.Vol.), State Gov't Article, § 10–215(g)(3)(vi)). It is only logical to apply this same standard to an agency's decision not to open a proceeding to the receipt of further evidence.

record in this case. Both legally and practically speaking, therefore, ALJ Spencer was in the best position to make the determination of whether further evidence was needed.

### B. "Full Back Pay" and State–Offered Benefits

■ Reier's question requires us to determine whether State-offered benefits are contemplated in the award of "full back pay", as the latter phrase is used in State Personnel and Pensions Article § 11–110(d)(1)(iii). We conduct a *de novo* review of the ALJ's legal conclusion that benefits are not included in "full back pay" as the question is one of statutory interpretation and, therefore, a purely legal inquiry. *Schwartz v. Dep't of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005); *Charles County Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 295, 855 A.2d 313, 319 (2004); *Spencer v. Bd. of Pharmacy*, 380 Md. 515, 528–29, 846 A.2d 341, 348–49 (2004); *Coleman v. Anne Arundel County Police Dep't*, 369 Md. 108, 121, 797 A.2d 770, 778 (2002).

■ The ultimate objective of our analysis is to extract and effectuate the actual intent of the Legislature in enacting the statute. *Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487 (2004); *Price v. State*, 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003). This process begins with an examination of the plain language of the statute. Section 11–110(d)(1)(iii) does not state expressly whether "full back pay" embraces benefits. Reier interprets the plain language of the statute to include benefits in "full back pay" for terminations because benefits are permitted for lesser disciplinary sanctions. The SDAT, on the other hand, points out that the organization and structure of § 11–110(d)(1) specifically includes benefits as part of the compensation for lesser disciplinary actions not involving a "break in service", but makes no mention of benefits as part of "full back pay" awarded in response to an invalid termination. This, the SDAT argues, indicates that the General Assembly purposefully decided to exclude benefits from full back pay as part of the relief available to a employee successful in upsetting his or her termination, whether on a technicality or otherwise. It strikes us that the competing parties' argu-

ments present "two ... reasonable alternative interpretations of the statute," making the statute ambiguous and subject to a more expansive investigation of the field in our quest for legislative intent. *Deville,* 383 Md. at 223, 858 A.2d at 487 (citing *Price,* 378 Md. at 387, 835 A.2d at 1226). Therefore, we may employ "all the resources and tools of statutory construction at our disposal," *Deville,* 383 Md. at 223, 858 A.2d at 487, including "legislative history, prior case law, and statutory purpose." *Id.* (citing *Melgar v. State,* 355 Md. 339, 347, 734 A.2d 712, 716 (1999)). After so doing, we conclude it more likely so than not that the General Assembly meant for the phrase "full back pay" in § 11–110(d)(1)(iii) to encompass State-offered benefits, including insurance, leave, status, and service credit.

The word "full" connotes a comprehensive approach to compensation such that it includes all of the incidents and benefits of State employment.[22] As we noted in *Geiger II,* the State personnel management system underwent a panoptic legislative revision in 1996 on the initiative of Governor Glendening. 371 Md. at 145, 807 A.2d at 44. The Governor established a Task Force to Reform the State Personnel Management System in 1995,[23] which produced on 16 January 1996 its final Report to the Governor (Task Force Report) containing findings and recommendations. *Geiger II,* 371 Md. at 145–46, 807 A.2d at 44–45. This report formed the basis of the subsequently introduced cross-filed bills of House Bill 774 and Senate Bill 466, later codified as the State Personnel

---

22. The word "full", itself, is indicative of completeness. WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 497 (1989). It also may be understood to mean "having all distinguishing characteristics: enjoying all authorized rights and privileges". *Id.* Other definitions accord with this conception of the term. *See, e.g.,* COMPACT OXFORD ENGLISH DICTIONARY 642 (2d ed.1991) ("answering in every respect to a description; possessed of all the qualifications, or entitled to all privileges implied in a designation"); BALLANTINE'S LAW DICTIONARY 506 (3d ed.1969) ("ample, complete; perfect; not wanting in any essential quality").

23. *Geiger II,* 371 Md. at 145, 807 A.2d at 44 (citing Executive Order No. 01.01.1995.15).

Management System Reform Act of 1996 (Reform Act).[24] The Reform Act "generally reflect[ed] the Task Force recommendations" [25] and "was passed in substantially the same form as proposed by the Task Force." *Geiger II,* 371 Md. at 146, 807 A.2d at 45. Thus, the General Assembly's reliance on the Task Force Report serves as guidance for our interpretation of the statute.

The original draft of House Bill 774 provided that § 11–110(d)(1)(iii)2 would read "full back pay, with a deduction for interim earnings from employment elsewhere or amounts earnable with reasonable diligence," thus providing a set-off for mitigation of damages accrued by the wrongfully disciplined employee. An amendment was introduced in the House of Delegates to strike the set-off language, in order to have the bill track the Task Force proposal that the OAH "may order back pay which will not be reduced by interim earnings from employment elsewhere and other earnings that could have been received." Task Force Report 48 (1996). The descriptive word "full" remained in the statute after elimination of the set-off language, evidencing that "full" possesses significance independent of the set-off language it had once accompanied. The SDAT essentially asks us to regard "full" as a meaningless vestige of the deleted set-off language. Our canons of statutory interpretation, however, forbid us to "construe a statute . . . so that [a] word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Blake v. State,* 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006); *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111, 1115 (2005); *Mid–Atl. Power Supply Ass'n v. Public Serv. Comm'n,* 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000); *Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling,* 343 Md. 155, 180, 680 A.2d 1052, 1065 (1996); *Montgomery County v. Buckman,* 333 Md. 516, 523–24, 636 A.2d 448, 452 (1994). We look to the surrounding provisions

**24.** Chapter 347, § 1 of the Acts of 1996.

**25.** COMAR 19A.96.09.

of § 11–110(d) to harmonize the various provisions of the statute and bestow the intended meaning to the word "full". *Bd. of Physician Quality Assurance v. Mullan*, 381 Md. 157, 168–69, 848 A.2d 642, 649 (2004); *Md. Green Party v. Bd. of Elections*, 377 Md. 127, 178–79, 832 A.2d 214, 244 (2003); *Bd. of County Comm'rs v. Bell Atl.-Md., Inc.*, 346 Md. 160, 178, 695 A.2d 171, 180 (1997).

While "full" is not used elsewhere in § 11–110, it appears in the subsubsubsection immediately following the recitation of restored "time, compensation, status, and benefits" as remedies for a wrongful termination. State Pers. & Pens. Article § 11–110(d)(1)(ii). Thus, "full" reasonably could be construed as a blanket word encompassing the list of remedies—"time, compensation, status, and benefits"—offered just above it. This interpretation is in accord with related Maryland jurisprudence. Since the Reform Act was codified, Maryland courts have conflated the provisions of § 11–110(d)(1)(ii) and (iii) so as to award both back pay and benefits. *See, e.g., Public Serv. Comm'n v. Wilson*, 389 Md. 27, 39, 40–41, 882 A.2d 849, 856–57 (2005) (indicating that a Circuit Court had awarded "back pay and benefits" as well as reinstatement as relief under § 11–110(d)(1)); *Dep't of Health & Mental Hygiene v. Rynarzewski*, 164 Md.App. 252, 254, 883 A.2d 205, 206 (2005) (upholding an ALJ's and Circuit Court's reinstatement of a terminated employee with back pay and benefits); *Dep't Public Safety & Corr. Servs. v. Neal*, 160 Md.App. 496, 507, 517, 864 A.2d 287, 293, 299 (2004) (upholding an ALJ's order that an employee's termination be rescinded and the employee be reinstated with full back pay under § 11–110(d)(1)(ii) and (iii)), *cert. denied*, 386 Md. 181, 872 A.2d 47 (2005). Wrongfully terminated State public sector employees generally receive benefits in addition to back pay as remedies for their improper dismissal. *See, e.g., Dep't of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 296, 641 A.2d 899, 905 (1994) (stating that a Circuit Court ordered a security attendant at a state hospital be reinstated with "back pay and any lost benefits"); *Sheriff of Baltimore City v. Abshire*, 44 Md.App. 256, 257, 408 A.2d 398, 399 (1979) (indi-

cating that the Secretary of Personnel of Maryland ordered a deputy sheriff to be "returned to duty with full back pay and benefits" after finding the charges for dismissing the deputy lacked proper support).

Furthermore, the entire State Personnel and Pensions Article, which we consider in its entirety to harmonize the applicable statutes, *Mayor & Town Council of Oakland v. Mayor and Town Council of Mountain Lake Park,* 392 Md. 301, 316–17, 896 A.2d 1036, 1045 (2006) (citing *Pete v. State,* 384 Md. 47, 65–66, 862 A.2d 419, 429–30 (2004)), seems to contemplate that benefits are intertwined inextricably with State employee pay. Section 2–502 establishes the State Employee Health Program, which State employees are permitted to join by virtue of § 2–507(a) in order to receive a subsidy from the State for health care insurance. While on leave with pay, § 9–103 provides that State employees do not lose their health insurance subsidy and continue to accrue seniority and leave based on the employee's regular hours. Conversely, when a State employee is in a "leave without pay status with regard to his employment[,] no deductions occur, no subsidies are provided and no leave or retirement credit accrues." *Corr. Pre–Release Sys. v. Whittington,* 119 Md.App. 436, 439, 705 A.2d 78, 80 (1998). The State Personnel and Pensions Article also grants State employees paid annual,[26] personal,[27] and sick[28] leave commensurate with certain formulas based upon the employee's length of service or start date. What is more, under §§ 9–304 and 305, unused annual leave may be redeemed for compensation at the employee's regular rate of pay, further linking leave with pay. Also, when setting or amending State employment pay rates, § 8–104(b) requires the Secretary of the Department of Budget and Management to consider, *inter alia,* the benefits offered to employees.

---

26. State Pers. & Pens. Article § 9–301(a).

27. State Pers. & Pens. Article § 9–401(a)(1).

28. State Pers. & Pens. Article § 9–501(a).

The SDAT argues that the statute's use of "or" in structuring the categories of relief available under the statute mandates a disjunctive reading of § 11–110(d)(1).[29] As support for its argument, the SDAT points specifically to the incompatible scenario of simultaneously upholding discipline under (d)(1)(i) and rescinding it under (d)(1)(ii). The SDAT further claims that the General Assembly intentionally spurned the Task Force Report's proposal to use "and/or" linking the possible actions available to the OAH as listed in (d)(1) by enacting the statute with the typically disjunctive word "or" separating the remedies. While it is true that "or" is read typically as a disjunctive, *see, e.g., County Council of Prince George's County v. Dutcher*, 365 Md. 399, 418, 780 A.2d 1137, 1149 (2001); *Schlossberg v. Citizens Bank of Md.*, 341 Md. 650, 657, 672 A.2d 625, 628 (1996), such is not always the case.

---

**29.** To illustrate the evolution of § 11–110(d)(1) in terms of its alleged disjunctive nature, we reproduce, with added emphasis, the section in its two relevant iterations: the Task Force Report and then § 11–110(d)(1) as codified in 1996.

*Task Force Report:*

3. The Office of Administrative Hearings:

a) May uphold the disciplinary action; *or*

b) Except as otherwise provided by this Title, may rescind or modify the disciplinary action and restore to the employee or former employee, as appropriate, any lost time, compensation, status or benefits; *and/or*

c) May order reinstatement to the position a former employee held when the former employee was dismissed or, if this is impractical, to a comparable position within the agency; *and/or*

d) May order back pay which w ill not be reduced by interim earnings from employment elsewhere and other earnings that could have been received.

*Section 11–110(d)(1) as codified in 1996:*

(d) *Additional action by Office of Administrative Hearings; final administrative decision.*—(1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:

(i) uphold the disciplinary action;

(ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; *or*

(iii) order:

　1. reinstatement to the position that the employee held at dismissal;

　2. full back pay; *or*

　3. both 1 and 2.

The term "or" may be read in the conjunctive when the context reasonably supports the inference that such a construction is necessary to effectuate the intent of the Legislature. We have stated previously that "[i]t is well settled that the terms 'and' and 'or' may be used interchangeably when it is reasonable and logical to do so." *Little Store, Inc. v. State*, 295 Md. 158, 163, 453 A.2d 1215, 1218 (1983); *see also Comptroller v. Fairchild Indus., Inc.*, 303 Md. 280, 286, 493 A.2d 341, 344 (1985) (stating that courts have the authority to construe the word "and" to mean "or" as required by context in order to comply with the clear legislative intent); NORMAN J. SINGER, 1A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 21:14 (6th ed.2002). The reasonably inferred intent of the General Assembly here was to permit (d)(1)(ii) and (iii) to be conjunctive options. In addition to the cases cited *supra* conflating the remedies of (d)(1)(ii) and (iii), the language used in the Task Force Report was followed substantially by the General Assembly. The Task Force Report, in its proposals that ultimately became (d)(1), separated subsubsubsections (i) and (ii) with an "or" and subsubsubsections (ii) and (iii) with an "and/or". We read this proposed language as evidence of the intent of the Legislature to permit either or both the rescission of a disciplinary action or the reinstatement of a dismissed employee and/or full back pay.[30] Moreover, the SDAT's attempt to distinguish the two subsubsubsections by limiting the reach of (d)(1)(iii) to "break in service" type disciplinary actions and (d)(1)(ii) to all lesser disciplinary actions is contrary to the disciplinary scheme outlined in § 11–104. Terminations clearly are included as a form of "disciplinary action" under § 11–104(6), along with the full compliment of lesser actions. Thus, it is not reasonable to parse terminations from other forms of discipline in the terms of § 11–110(d)(1)(ii) when it states that the OAH may "rescind or modify the *disciplinary action* taken". (Emphasis added).

---

**30.** In accordance with our assessment of the General Assembly's intent as manifested by the Task Force Report, it is clear that an ALJ cannot order that discipline be both upheld and rescinded.

The SDAT's attempt to segregate terminations from lesser forms of discipline would result further in an illogical and manifestly unfair administration of remedies for wrongful terminations. The SD AT's construction of (d)(1) would allow for the award of benefits to the recipients of erroneously-imposed less severe discipline, such as suspensions or the forfeiture of leave, but necessarily would preclude the award of benefits to those terminated wrongfully, the most severe administrative punishment. We do not perceive that the General Assembly purposefully chose to restore fully the time, compensation, status, and benefits lost by those wrongfully disciplined who suffer consequences of a lesser magnitude as a result of their discipline and deny that same extent of relief to those who have borne erroneously the ultimate employment sanction. *Gwin v. Motor Vehicle Admin.*, 385 Md. 440, 462, 869 A.2d 822, 835 (2005) (quoting *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106, 112 (1994)) ("Our interpretation of a statute should 'seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense.' "); *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 550, 814 A.2d 469, 490 (2002) ("[A]bsurd results in the interpretive analysis of a statute are to be shunned."); *Chesapeake Charter, Inc. v. Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625, 628 (2000) ("If, on the other hand, the language is susceptible to more than one meaning and is therefore ambiguous, we consider 'not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment,' and, in those circumstances, in seeking to ascertain legislative intent, we consider 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' ") (citations omitted); *Lewis v. State*, 348 Md. 648, 654, 705 A.2d 1128, 1131 (1998) ("We interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted. Such an interpretation must be reasonable and consonant with logic and common sense. In addition, we seek

to avoid construing a statute in a manner that leads to an illogical or untenable outcome.") (citations omitted); *Armstead v. State*, 342 Md. 38, 56, 673 A.2d 221, 229 (1996) ("In reading [statutory] language, we apply common sense to avoid illogical or unreasonable constructions...."); *Dickerson v. State*, 324 Md. 163, 171, 596 A.2d 648, 652 (1991) (quoting *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179–80 (1990), in turn quoting NORMAN J. SINGER, 2A SUTHERLAND STATUTORY CONSTRUCTION, § 45.12 (4th ed.1984)) ("In fact, 'unreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result.' "); *State v. Fabritz*, 276 Md. 416, 422, 348 A.2d 275, 279 (1975) ("In construing statutes, therefore, results that are unreasonable, illogical or inconsistent with common sense should be avoided whenever possible consistent with the statutory language, with the real legislative intention prevailing over the intention indicated by the literal meaning."); *see also* NORMAN J. SINGER, 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 45.12 (6th ed. 2000) ("It has been called a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result."). There is no better illustration of the necessity to reject an untenable reading of a statute to avoid absurd results than the SDAT's construction of § 11–110(d)(1) in the instant case. Over ten years have elapsed since Reier was terminated by the SDAT, during which time he has been deprived of his accrued State-offered benefits. It is wholly unreasonable that the General Assembly would intend an employee in Reier's position to be deprived of entitled benefits while permitting an employee suspended for one day be made entirely whole.

Our assessment of the intent of the General Assembly in Reier's case is consistent with that body's most recent

amendment to § 11–110(d)(1)(iii),[31] apparently enacted in reaction to the Court of Special Appeals's decision in *Reier II.* Although the "subsequent amendment . . . of a statute is not controlling as to the meaning of the prior law," *Romm v. Flax,* 340 Md. 690, 698 n. 2, 668 A.2d 1, 5 n. 2 (1995) (quoting *Am. Recovery Co. v. Dep't of Health,* 306 Md. 12, 18, 506 A.2d 1171, 1174 (1986)), "subsequent legislation can be consulted to determine legislative intent." *Nesbit v. Gov't Employees Ins. Co.,* 382 Md. 65, 78, 854 A.2d 879, 886–87 (2004) (citing *Tracey v. Tracey,* 328 Md. 380, 385–387, 614 A.2d 590, 593–94 (1992)); *see also Swarthmore Co. v. Comptroller,* 38 Md.App. 366, 373, 381 A.2d 27, 30 (1977) ("[A] subsequent 'statute purporting to declare the intent of an earlier one might be of great weight in assisting a court when in doubt.' ") (quoting *United States v. Stafoff,* 260 U.S. 477, 480, 43 S.Ct. 197, 199, 67 L.Ed. 358, 361 (1923)). Senator Delores Kelley introduced Senate Bill 1080 on 8 March 2006, just three legislative working days after *Reier II* was filed on 3 March 2006. In Senator Kelley's testimony before the Senate Finance Committee on 23 March 2006, she specifically indicated that her sponsorship of the bill was motivated by the intent to "codify decades of practice by administrative law judges" of rescinding wrongful terminations or suspensions and restoring back pay with benefits.

---

**31.** Chapter 553, § 1 of the Acts of 2006. The cross-filed bills of Senate Bill 1080 and House Bill 1726 were passed by both chambers in early April 2006. Senate Bill 1080 became law without the signature of Governor Ehrlich on 26 May 2006, in accordance with Maryland Constitution Article 2, § 17(c). As a result of the new law, § 11–110(d)(1) now reads as follows:

(d) *Additional action by Office of Administrative Hearings; final administrative decision.*—(1) Except as otherwise provided by this subtitle, the Office of Administrative Hearings may:
(i) uphold the disciplinary action;
(ii) rescind or modify the disciplinary action taken and restore to the employee any lost time, compensation, status, or benefits; or
(iii) order:
 1. reinstatement to the position that the employee held at dismissal;
 2. full back pay *and benefits;* or
 3. both 1 and 2
(emphasis added).

This practice, she noted, was disturbed by the *Reier II* decision which held that the Legislature could not have intended "full back pay" to comprise both wages and benefits. The Committee favorably reported the bill the next day and it was passed on its third reading on the following day. Senator Kelley, we note, served as a member on the same Senate Finance Committee that considered the Reform Act in 1996, containing the original § 11–110(d)(1), as the 2006 amendment.

Having resolved that Reier was eligible for "full back pay," including State-offered benefits, further proceedings will be necessary to identify more precisely which benefits and amounts Reier may receive. At this juncture it is only determinable from the record that Reier was not a member of the State Employee Health Program and not receiving a subsidy for health insurance under that program at the time that he was terminated.[32] Thus, he cannot receive reimbursements from the State for its share of the medical expenses he may have incurred since his termination had he been a member of the Program. *See Whitlow v. City of Birmingham,* 689 So.2d 107, 109 (Ala.Civ.App.1996) (holding that a reinstated public employee "would not have received the dollar amount of the City's contributions to her health insurance coverage", but rather "she would have received the benefit of those contributions-continued health insurance coverage").

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR REMAND TO THE MARYLAND OFFICE OF ADMINISTRATIVE HEARINGS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

---

**32.** Reier completed an open enrollment form on 24 October 1995 and elected to cancel his existing health care benefits with the State and evidently chose to pursue coverage under a COBRA policy.